827 So.2d 488 (2002)
STATE of Louisiana, Appellee,
v.
Michael Lewis MURRAY, Appellant.
No. 36,137-KA.
Court of Appeal of Louisiana, Second Circuit.
August 29, 2002.
*490 Amy C. Ellender, Paula C. Marx, Lafayette, Louisiana Appellate Project, for Appellant.
Richard Ieyoub, Attorney General, Paul J. Carmouche, District Attorney, Dale Cox, Assistant District Attorney, for Appellee.
Before NORRIS, GASKINS and PEATROSS, JJ.
GASKINS, J.
The defendant, Michael Lewis Murray, appeals his conviction for second degree murder. For the following reasons, the conviction and sentence are affirmed.

FACTS
In 1998, the defendant joined a church-affiliated singles group. The victim of the present offense, Ron Green, was also a member of the group. Mr. Green was a self-employed disc jockey and assembled sound equipment at his home in Bossier City. The defendant did computer work at his home. The two men were friends who frequently collaborated with each other on sound and computer projects. They often e-mailed each other. The defendant had been to the victim's house on numerous *491 occasions. Both men were on the board of the singles group and saw each other at least weekly for about two years.
The victim was very popular and dated numerous women in the singles group, including some that were also on the board. The victim had a girlfriend in the group, Katie Mayeaux, but they had an open relationship and dated others simultaneously. At one point, the defendant and the victim both socialized with Ms. Mayeaux. However, at that time, the defendant did not know that she dated the victim. Apparently, the defendant was surprised when he learned about this.
For a brief time, the defendant had his own girlfriend in the group, Mary Tellez, who did not date the victim. However, Ms. Tellez stated that the defendant frequently warned her about the victim. He told her that the victim would try to use her. According to Ms. Tellez, the defendant said that he was upset over the way the victim was running the singles group and was aggravated that the victim was having sex with the women on the board. Ms. Tellez couldn't remember if she told the defendant about instances in which she had lunch with the victim to discuss the business of the singles group. After about six months, Ms. Tellez ended her relationship with the defendant, but they remained friends.
The defendant voiced to several of his friends his displeasure with the victim, indicating that he felt the victim was using his romantic associations with the female board members to gain control of the board and the singles group.
The defendant's family owned houses on Wagner Street and on Laguna Street in Shreveport. At the time of the offense, the defendant lived with his children on Laguna Street and used the Wagner Street house for storage. He and his wife were divorced, and he had custody of his 11-year-old daughter and 9-year-old son. In late summer 2000, the defendant's children were visiting their mother in Arkansas.
On July 29, 2000, the defendant accompanied Ms. Tellez to a local water park. A former member of the singles group saw them there and inquired if they were back together. The defendant said they were not. The friend asked how things were going in the singles group. The defendant responded, "Not so well, but that may change soon." That night due to bad weather, Ms. Tellez stayed at the defendant's house. She testified that "one thing led to another." They conceived a child that evening that was a little more than two months old at the time of trial.
On July 30, 2000, the defendant saw a friend at church and they talked for 10 to 15 minutes. The defendant expressed displeasure over a lecture the victim had given to the singles group. He also stated that he thought the victim controlled the group and that the victim was "doing" three of the women in the group.
On the afternoon of Monday, August 7, 2000, the defendant shot and killed the victim. The defendant gave the following account of what transpired. The defendant called the victim several times that day to get him to come to the house on Wagner Street. Although he had never asked the victim for a ride before, the defendant claimed that he needed to drop his uncle's car off at the airport and wanted the victim to follow him out there and bring him home. He also claimed that he wanted the victim to give him some advice about repairing a china cabinet stored at the Wagner Street house. He stated that he wanted to ask the victim about the substitution of a component in a circuit the victim had designed. He further claimed that, because the victim was knowledgeable *492 about guns, he wanted the victim to advise him as to the price he might be able to get for his .38 caliber revolver. According to the defendant, they had discussed the gun before at the singles group, but did not discuss the gun on the phone that day, because the victim did not like to talk about guns on the phone.
The defendant called the victim's house at 11:33 a.m., 12:10 p.m., and 12:29 p.m., but got no answer. The victim returned the defendant's call at 12:30 p.m. The victim had some other calls to return and the defendant said that he would call the victim back shortly. At 12:59 p.m., the defendant again called the victim and asked him to come to the Wagner Street house. He then got the gun out, which was loaded, and waited for the victim to arrive.
According to the defendant, the victim arrived at the Wagner Street house around 1:20 p.m. The defendant testified that he was outside. He shook hands with the victim and they went inside the house. The defendant contended that the victim did not seem to be as charismatic as he usually was. The victim gave an opinion about the furniture that was not to the defendant's liking. He stated that some particle board on the piece was probably broken. The defendant thought that the cabinet predated particle board.
As the defendant examined the furniture himself, the victim walked over and picked up the gun. The defendant claimed that he warned the victim that the gun was loaded. The victim made a comment about people not doing what they tell you and mentioned that he had asked Ms. Mayeaux to marry him. The defendant went to the kitchen for some bottles of water for the trip to the airport. When he returned to the living room, he asked the victim if he had unloaded the gun. The victim did not answer, but asked, "Why do people lie to you?" as he waved the gun around, talking with his hands. The defendant asked the victim to point the gun the other way. The victim turned back to the defendant, pointed the gun at him and asked, "How does it feel?" The defendant said that the victim had almost a grin or a smile on his face as he moved toward the defendant and it was almost as if he were looking through the defendant.
The defendant claimed that he reached to take the gun, but the victim resisted. The defendant said that he told the victim to give him the gun, but the victim did not respond. The defendant stated that they fell to the living room floor in a struggle for the gun, with all four of their hands on the gun. The defendant contended that the victim kicked him in the face and chest and that he bit the victim's calf. The victim was five feet nine inches tall, weighed between 140 and 150 pounds, and was in good physical shape. The defendant was five feet eleven inches tall, weighed approximately 202 pounds, and was not as physically fit as the victim.
As the struggle for the gun continued, the defendant began to tire. He claimed that he jerked the gun and it discharged, striking the victim in the right leg. The victim relaxed and the defendant took control of the gun. Both men stood up. The victim said, "You shot me," and started toward the defendant. The defendant claimed that he then shot the victim twice in the chest. The defendant stated that at that point, he passed out. When the defendant revived, he claimed that the victim was dead.
Instead of calling for help, the defendant contended that he panicked and was afraid that he would lose his children. He stated that he thought the story of what transpired would sound illogical. The defendant stated, "I thought well, maybe I can make it disappear and I considered covering it up at that point...." He said that he *493 wanted to keep his children and that he would walk into a burning building to save his children. He stated that, "Covering this up seemed like a relatively small thing compared to that."
The defendant tried to conceal this incident. He moved the body to the bathtub in the house. He used a kitchen knife to cut the victim's throat, severing the jugular and the windpipe. The defendant claimed he did this to get rid of the blood because the sight of blood made him ill. He turned on the air conditioner and wet the body down, thinking that evaporation would keep it cooler. He removed some boxes that the victim had bled upon and tried to get blood stains out of the carpet. The defendant took the victim's pager, car keys, and some other items and hid them at his house on Laguna Street.
The defendant had a long-time friend, Walter Weferling. The defendant frequently worked for Weferling installing computer and telephone networks. Weferling called the defendant on the afternoon of August 7, 2000, and asked whether he would be available to do some work. The defendant asked Weferling to help him move a car later in the day. At around midnight, the defendant called Weferling to help with the car. The defendant drove the victim's car back to his home in Bossier City near the Cordova apartments. Weferling followed and gave the defendant a ride back to the Wagner Street house. Weferling said that when the defendant got out of the victim's car, he was holding a rag. On the way home, the defendant told Weferling that he had shot and killed someone and asked about rigor mortis. The next morning, Weferling contacted the police.
On Tuesday, the defendant purchased a trash can to try to move the body, but due to its size and rigor mortis, it would not fit into the can. The defendant continued to wet the body down in the bathtub. Also on Tuesday, he went to the victim's residence and removed his caller ID device, to retard discovery that he had called the victim's number several times on Monday. He took some dog food with him to feed the victim's dog.
That evening, the singles group had their weekly meeting. It was unusual for the victim to miss a meeting of the singles group and no one in the group knew where he was. When he did not make the meeting, the members, including Ms. Tellez, were worried. She decided to go to the victim's house. The defendant accompanied her. She noted that the victim's car was there and nothing seemed out of place. The victim's girlfriend, Ms. Mayeaux, was out of town and it was thought that the victim might have gone with her. Upon returning to the church, Ms. Tellez called the police. She went back to the victim's house later that night.
Around 8:30 to 9:00 p.m., the police came to the victim's house along with Robby Adkins, an employee of the victim. Adkins had not seen the victim since Sunday, August 6, 2000. A missing person report was filed. Adkins had a key to the house and on Wednesday, August 9, 2000, he noticed that the caller ID unit was missing.
On Wednesday, the defendant again returned to the Wagner Street house and wet down the body. The next day, August 10, 2000, the defendant worked on a job with Weferling, but did not discuss the killing. He then decided to make another effort to move the body. He wheeled a larger trash can into the bathroom. He cut the victim's clothes off and put the body into the trash can. The defendant wheeled it to a tin building behind the house and filled the trash can with water. He then added septic bacteria and sugar in an attempt to cover the odor and hasten decomposition. He took the victim's *494 clothing to his home on Laguna Street where he burned it along with the victim's driver's license and some other personal effects from his wallet. He also burned the boxes that the victim bled upon at the time of the shooting.
On Friday, August 11, 2000, the defendant noted that the odor was still present and decomposition was not progressing as fast as he thought it would with the septic bacteria and sugar. He called Weferling and asked to borrow a pickup truck to take care of his "dilemma." Weferling's girlfriend had a pickup truck that they agreed to lend to the defendant.
According to the defendant, he bailed the water out of the trash can and then poured out as much of the water as he could. He lifted the can onto the bed of the truck. He put a rope around the can and propped the lid open slightly with a piece of wood to promote air flow and hasten decomposition. He drove the body to family property in Blanchard and stored it in an old feed barn. Some of the water and "sludge" got onto the truck. He washed the truck before returning it to Weferling.
That Friday, Weferling saw a report on television regarding the disappearance of the victim. He had met the victim and was aware that the defendant knew the victim also. He put the information together and concluded that the victim might be the person that the defendant had shot and killed. Weferling called the police again. The police examined the truck and were immediately aware of the strong odor of human decomposition. A cadaver dog was brought in and alerted on the truck.
At 11:30 p.m. on Friday, August 11, 2000, law enforcement officials contacted the defendant at his home on Laguna Street. The defendant agreed to go to the station with the officers. The defendant was given his Miranda rights and agreed to talk with police about some portions of the incident. However, he stated that there were portions of the incident that he wanted to talk with a lawyer about first. The defendant was supposed to pick up his children in Arkansas on Saturday, August 12, and was concerned about being released in time to fulfill that obligation. The defendant claimed that he killed the victim in self-defense. He also claimed that nothing like this had ever happened to him before.
The defendant typed a statement and then took the officers to the body and the gun. The victim's decaying body was found in a trash can in a feed barn in Blanchard. The defendant also took the officers to the Wagner Street house where blood stains were discovered in the carpet and bullet fragments were recovered. The defendant then showed the officers where he had poured the water from the trash can. Hair and skin were recovered from that area.
The defendant took the officers to the house on Laguna Street where he had hidden the gun and had burned the victim's clothing and some personal items. He also pointed out some injuries on his face, chest, and leg that he claimed were sustained in the struggle with the victim. These were photographed by the police.
The defendant was then released and picked up his children in Arkansas. On August 13, 2000, the defendant was arrested; he was charged by grand jury indictment with the second degree murder of Mr. Green.
The defendant was tried by jury on June 27-July 3, 2001. The defendant was found guilty as charged in a unanimous verdict.
On August 22, 2001, the court imposed the mandatory sentence of life imprisonment, without benefit of parole, probation, or suspension of sentence. The defendant *495 filed motions for new trial and post verdict judgment of acquittal which were denied by the trial court. The defendant then appealed, arguing numerous assignments of error.

SUFFICIENCY OF THE EVIDENCE
The defendant claims that the evidence was not sufficient to support the verdict of second degree murder. According to the defendant, the state failed to prove that he did not act in self-defense in killing the victim. He also contends that the state did not show beyond a reasonable doubt that he had the requisite specific intent to kill or inflict great bodily harm. The defendant argues that the state failed to show a motive for killing the victim. The defendant urges that the victim was acting in a crazed manner and the defendant could not withstand another prolonged struggle with the victim. Because the defendant felt that he was in danger of being killed, he acted reasonably in shooting the victim. He disputes evidence and testimony that the victim was still alive when the defendant cut his throat. The defendant points to his injuries as corroboration of his self-defense claim. Although he admits that the cover-up of the incident was improper, he claims that his actions were not indicative of specific intent and he did so, not to conceal his guilt, but to prevent losing custody of his children. In the alternative, the defendant argues that, at most, he could only be convicted of manslaughter. These arguments are without merit.
The question of sufficiency of the evidence is properly raised by a motion for post verdict judgment of acquittal. La. C.Cr.P. art. 821; State v. Gay, 29,434 (La. App.2d Cir.6/18/97), 697 So.2d 642. The record shows that the defendant properly raised the issue of sufficiency of the evidence in the trial court in a motion for post verdict judgment of acquittal, which was denied by the trial court.
Under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of appellate review for a sufficiency of evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Bosley, 29,253 (La.App.2d Cir.4/2/97), 691 So.2d 347, writ denied, 97-1203 (La.10/17/97), 701 So.2d 1333.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Owens, 30,903 (La.App.2d Cir.9/25/98), 719 So.2d 610, writ denied, 98-2723 (La.2/5/99), 737 So.2d 747.
When circumstantial evidence forms the basis for conviction, such evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438. The court does not determine whether another possible hypothesis suggested by the defendant could afford an exculpatory explanation of the events; rather, when viewing the evidence in the light most favorable to the prosecution, the court determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond *496 a reasonable doubt under Jackson v. Virginia. This is not a separate test from Jackson v. Virginia. State v. Owens, supra.
This court's authority to review questions of fact in a criminal case is limited to the sufficiency-of-the-evidence evaluation under Jackson v. Virginia and does not extend to credibility determinations made by the trier of fact. State v. Williams, 448 So.2d 753 (La.App. 2d Cir. 1984). A reviewing court accords great deference to the trier of fact's decision to accept or reject the testimony of a witness in whole or in part. State v. Bosley, supra; State v. Rogers, 494 So.2d 1251 (La. App. 2d Cir.1986), writ denied, 499 So.2d 83 (La.1987).
The defendant was convicted as charged of second degree murder. Second degree murder is defined, in relevant part, as "the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm." La. R.S. 14:30.1.[1]
Specific intent is a state of mind and need not be proved as a fact; it may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982); State v. Taylor, 621 So.2d 141 (La.App. 2d Cir.1993), writ denied, 93-2054 (La.2/11/94), 634 So.2d 371. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); State v. Lindsey, 543 So.2d 886 (La.1989), cert. denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Brown, 618 So.2d 629 (La.App. 2d Cir.1993), writ denied, 624 So.2d 1222 (La.1993).
Evidence of flight, concealment, and attempt to avoid apprehension indicates consciousness of guilt. State v. Davies, 350 So.2d 586 (La.1977); State v. Thompson, 33,204 (La.App.2d Cir.3/01/00), 754 So.2d 412.
The discharge of a firearm at close range and aimed at a person is indicative of a specific intent to kill or inflict great bodily harm upon that person. State v. Johnson, 27,522 (La.App.2d Cir.12/06/95), 665 So.2d 1237; State v. Wallace, 612 So.2d 183 (La.App. 1st Cir.1992), writ denied, 614 So.2d 1253 (La.1993).
This court in State v. Hudson, 33,357 (La.App.2d Cir.5/10/00), 760 So.2d 591, set forth the law applicable to a claim of justifiable homicide because of self-defense:
Self-defense is justification for a killing only if the person committing the homicide reasonably believes he is in imminent danger of losing his life or receiving great bodily harm and that deadly force is necessary to save his life. La. R.S. 14:20(1); State v. Cotton, [25,940] (La.App.2d Cir.3/30/94), 634 So.2d 937; State v. Jones, 600 So.2d 875 (La. App. 1st Cir.1992), writ denied, 92-2351 (La.5/12/95), 654 So.2d 346. The state has the affirmative duty of proving beyond a reasonable doubt that the killing was not in self-defense. State v. Arnold, 30,282 (La.App.2d Cir.1/21/98), 706 So.2d 578.

*497 For a homicide to be justified, the offender must have had a reasonable belief he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary, under the circumstances, to save himself from that danger. La. R.S. 14:20(1); State v. Dozier, 553 So.2d 911 (La.App. 4th Cir.1989), [writ denied], 558 So.2d 568 [(La.1990)].
Factors to consider in determining whether a defendant had a reasonable belief the killing was necessary are the excitement and confusion of the situation, the possibility of using force or violence short of killing and the defendant's knowledge of the assailant's bad character. State v. Hardeman, 467 So.2d 1163 (La.App. 2d Cir.1985). Although there is no unqualified duty to retreat, the possibility of escape is a factor to consider in determining whether a defendant had a reasonable belief that the use of deadly force was necessary to avoid the danger. State v. Brown, 414 So.2d 726 (La.1982).
When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Garcia, 483 So.2d 953 (La.1986); State v. Flowers, 574 So.2d 448 (La.App. 2d Cir.1991), writ denied, 580 So.2d 666 (La.1991).
As is always the case in a homicide where only two people are present, the only eyewitness available to testify at trial regarding how the victim died was the defendant. The defendant admitted that, using his own gun, he shot the victim twice in the chest while the victim was unarmed. Although the defendant's self-serving testimony was that he shot the victim in self-defense, the jury obviously chose to reject his testimony.
The defendant claimed that the victim carelessly waved, then pointed the gun at him. The defendant claimed that a struggle took place during which the victim was shot in the leg. Subsequently, the defendant stated that the victim charged at the defendant, and the defendant shot him. These statements were impeached by the state's evidence.
Michael Lombardino, a friend of the victim, testified that the victim was knowledgeable about guns and had a serious demeanor around them. Lombardino had never seen the victim wave a gun around carelessly.
Ms. Mayeaux testified that the victim was very responsible around guns. She also said that the victim had not asked her to marry him.
Rod Johnson, a detective with the Shreveport Police Department, observed the injuries the defendant claimed to have received in the altercation. He noted that the injury to the face appeared to be an old wound. Photographs of these injuries show that they are relatively minor.
An autopsy was performed on the victim by Dr. Karen Ross and was photographed by Dr. Steven Cogswell. Dr. Cogswell testified that the victim most likely sustained the first gunshot wound to the chest while sitting down and the second wound was inflicted while the victim was lying down. Dr. Cogswell testified that the wounds were not consistent with the defendant's testimony that the victim was coming toward him when he fired the gun. He opined that the gun would have been waist or thigh high when fired. Both Dr. Ross and Dr. Cogswell noted that there were no wounds to the victim's legs, negating the defendant's testimony that the gun discharged and the victim was shot in the leg. Dr. Ross also did not find any defensive wounds on the victim's body which would have indicated a struggle.
*498 Dr. Ross said that the victim sustained two gunshot wounds to the chest and a five-inch long cut on the right side of the neck which severed the jugular vein and cut the windpipe. She testified that although the victim could have died of either the gunshots or the neck wound, the gunshot wounds would not have been immediately fatal. The victim could have lived for some minutes and up to an hour after the gunshot wounds were inflicted. This view was corroborated by Dr. Cogswell.
Dr. Ross noted that the victim died of loss of blood, but there was not as much blood in the right chest as would be expected with gunshot wounds. She stated that the most reasonable explanation is that the blood went down the tub drain after the victim's throat was cut. Dr. Cogswell concurred in that opinion, noting that only a small amount of blood was found at the crime scene. Dr. Ross opined that the victim bled heavily from the neck wound. She also testified that, while not conscious, the victim was still alive when his neck was cut. She stated that the tissue around the cut was consistent with hemorrhage, indicating that the victim was alive when his throat was cut. She said that if his throat had not been cut, timely medical intervention could have saved the victim's life.[2]
Kevin Chatelain of the Shreveport Fire Department testified that paramedics could have responded to the shooting on Wagner Street within 4½ to 5½ minutes and the victim could have been transported to a hospital within 30 minutes.
In addition to the failure of the physical evidence to support the defendant's version of the shooting, his description of the victim's demeanor on the day of the shooting was contrary to the testimony of witnesses regarding the victim's personality. The record shows that the victim was an outgoing, likeable person who took guns and gun safety very seriously. Also, the victim had not asked his girlfriend to marry him. Therefore, the defendant's description of the victim on the day of the crime as upset and maniacal, talking about asking his girlfriend to marry him, and carelessly waving a gun around and intentionally pointing it at the defendant could have been discounted by the jury.
The defendant also gave numerous explanations as to how he got the victim to come to the Wagner Street house, a place he had never visited before.
While the defendant stated that he responded as he did because he had never been in a situation like this before, he in fact had been involved in a similar incident. In 1978, while single and living in a family home on Wagner Street in Shreveport, a drunken co-worker came to the house during the night and threatened the defendant with a tire iron. Apparently the man was angry that the defendant had lunch with a woman the assailant was interested in. The defendant shot the individual in the abdomen. He claimed that he purposely aimed low in an effort not to kill the man. After being shot, the individual fled the scene in his car and was found by police a short time later after wrecking the car. Immediately after the shooting, the defendant called the police and his lawyer. The assailant did not die and he corroborated the defendant's version of the incident. No charges were filed against the defendant because the shooting was in self-defense.
The defendant's credibility was also impeached with evidence of a prior felony *499 conviction. In 1981, the defendant was employed as a computer programmer for a money order company. He misappropriated approximately $140,000.00 in money orders. He pled guilty to felony theft and served five years of a seven-year sentence.
Regarding a motive for this shooting, the record is replete with instances in which the defendant voiced his disapproval of the victim, the way he conducted the singles group and the manner in which he led his personal life. The record also shows that the defendant was jealous of the victim, particularly with regard to Ms. Tellez, with whom the defendant had a sexual encounter just prior to the murder.
Based upon this record, the jury could reasonably find that the defendant was not in imminent danger of losing his life or receiving great bodily harm from the victim and that killing was necessary under the circumstances to save himself. The defendant's self-defense scenario was so unbelievable that even he did not think anyone would believe him. The facts established by direct evidence and inferred by the circumstances, viewed in the light most favorable to the prosecution, show that a rational trier of fact could have found beyond a reasonable doubt that the homicide was not committed in self-defense.
Having determined that there was sufficient evidence that the homicide was not committed in self-defense, the defendant's specific intent to kill or to inflict great bodily harm upon the victim is easily supported by the record. The defendant's specific intent need not be proved as a factit may be inferred from the circumstances of the crime and the defendant's actions. See State v. Graham, supra; State v. Taylor, supra. The fact that the defendant shot the victim in the chest twice with a pistol at a fairly close range indicates a specific intent to kill or inflict great bodily harm. See La. R.S. 14:30.1(A)(1); State v. Wallace, supra; State v. Price, 498 So.2d 244 (La.App. 1st Cir.1986), writ denied, 503 So.2d 474 (La. 1987). See also State v. Johnson, supra. Then, after shooting the victim, the defendant did not try to get medical attention for the victim. Instead, he placed the victim in a bathtub and cut his throat.
The fact that some of the experts opined that the victim was still alive when his throat was slit would also indicate the defendant's specific intent to kill or inflict great bodily harm. Furthermore, even if the victim was dead when the defendant slit his throat to drain the victim's blood, this action, and the defendant's other elaborate efforts to conceal the crime, destroy the victim's body and avoid apprehension, were indicative of the defendant's consciousness of guilt. State v. Davies, supra; State v. Thompson, supra.
Viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all of the elements of second degree murder were proved beyond a reasonable doubt. Jackson v. Virginia, supra.

MOTION TO SUPPRESS
The defendant argues that the trial court erred in denying his motion to suppress statements made and evidence seized following his statement due to improper conduct by the police during his interrogation. The defendant claims that the police impermissibly promised that if he would give a statement and tell them where the body and the gun were located, he would not be arrested on the night he was questioned. He was anxious to be free the next day to pick up his children in Arkansas following visitation with their mother. He also claims that, even though he made a limited request for counsel, interrogation should have immediately *500 ceased as to all matters. He claims that because his right to counsel was violated, his statement and the physical evidence should be suppressed as "fruit of the poisonous tree." This argument is without merit.
The purpose of a suppression hearing is to determine if evidence should be presented at trial. State v. Goodman, 99-2352 (La.App. 4th Cir.10/13/99), 746 So.2d 693. In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion, but also may consider pertinent evidence given at trial. State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993).
Before introducing a confession into evidence, the state must establish that the accused was advised of his constitutional rights under La. Const. art. 1 § 13 and Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Hobley, 98-2460 (La.12/15/99), 752 So.2d 771, cert. denied, 531 U.S. 839, 121 S.Ct. 102, 148 L.Ed.2d 61 (2000). In Miranda, the United States Supreme Court recognized the coercive atmosphere created by police custody and established a procedural mechanism to safeguard the exercise of a defendant's Fifth Amendment rights. Before interrogating a suspect in custody, law enforcement officials must inform the suspect that he has the right to remain silent, that his statements may be used against him at trial, that he has a right to an attorney, and that if he cannot afford an attorney, one will be appointed for him. State v. Hobley, supra.
In addition, once a suspect expresses his desire, at any stage of the process, to deal with the police only through counsel, all questioning must cease, and the accused may not be subject to further interrogation until counsel has been made available to him, unless he initiates further communication, exchanges or conversation with the police and validly waives his earlier request for counsel. State v. Hobley, supra.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Roddy, 33,112 (La. App.2d Cir.4/7/00), 756 So.2d 1272, writ denied, XXXX-XXXX (La.5/11/01), 791 So.2d 1288. Before the state can introduce an inculpatory statement made in police custody, it bears the heavy burden of establishing that the defendant received Miranda warnings and that the statement was freely and voluntarily made and not the product of promises, threats, or duress. La.C.Cr.P. art. 703; La. R.S. 15:451; State v. Petterway, 403 So.2d 1157 (La. 1981).
The admissibility of a confession is in the first instance a question for the trial judge. His conclusion on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility will not be overturned on appeal unless unsupported by the evidence. State v. Benoit, 440 So.2d 129 (La.1983); State v. Dailey, 607 So.2d 904 (La.App. 2d Cir.1992), citing State v. Jackson, 381 So.2d 485 (La.1980). We place great weight upon the trial court's factual determinations because of that court's opportunity to observe witnesses and assess credibility. State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082. See also State v. Normandin, 32,927 (La.App.2d Cir.12/22/99), 750 So.2d 321, 324, writ denied, XXXX-XXXX (La.9/29/00), 769 So.2d 550; State v. Williams, 98-1006 (La.App. 5th *501 Cir.3/30/99), 735 So.2d 62, 73, writ denied, 99-1077 (La.9/24/99), 747 So.2d 1118.
However, the United States Supreme Court has recognized that a defendant may make a limited invocation of the right to counsel. In Connecticut v. Barrett, 479 U.S. 523, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court found that a defendant was entitled to invoke his right to counsel as to written statements only and any information that he gave in oral statements could be used against him. The Supreme Court found that the limited invocation of the right to counsel does not preclude the admissibility of statements a defendant makes which fall outside the limited invocation. See United States v. Boyer, 914 F.2d 144 (8th Cir.1990), cert. denied, 499 U.S. 908, 111 S.Ct. 1110, 113 L.Ed.2d 219 (1991); United States v. Jacobs, 97 F.3d 275 (8th Cir.1996).
In this case, the defendant's limited invocation of his right to counsel was knowing and voluntary. The defendant understood his rights under Miranda and chose to invoke his right to counsel only with regard to limited details of the incident. The officers did not violate the limited invocation of the right to counsel. Further, the defendant freely chose to give his statement and to lead officers to the body and the gun.
Rod Johnson of the Shreveport Police Department testified that on the evening of August 11, 2000, he went to the defendant's house on Laguna Street along with another officer and some Caddo Parish Sheriff's deputies. The defendant was not placed under arrest and he agreed to accompany the officers to the police station. The defendant sat in the front seat of the police car and stated that he knew that he was a suspect. The defendant freely talked about the victim, even though that subject was not raised by police.
At the station, the defendant was given his Miranda rights. He said that he understood those rights and signed a waiver of rights form. He was asked about the house on Wagner Street and about the truck that he borrowed. The defendant stated that he wanted to talk to his lawyer about some things, but that he would talk about the rest. The defendant was asked if he wanted his lawyer. He replied that he would tell the "rest of it," but he wanted his lawyer for part of it.
The defendant gave the officers his lawyer's name. The officers tried to contact the lawyer by phone. However, they did not have a home phone number. They looked through the "water book" and obtained an address for the lawyer. The police testified that they offered to go to the lawyer's house, but the defendant did not request that they do so. According to the officer, "He just kept talking about he wanted to talk about it but not part of it."
At his house, the defendant had the lawyer's phone number and home address, but did not tell the officers that he had that information. He never requested that he be taken to get the information.
Officer Johnson asked the defendant what he wanted to do. The defendant again said that he wanted to talk about part of it and said that he wanted to discuss a hypothetical situation. The defendant was again given his Miranda rights. When the defendant asked, the officers told the defendant that he probably would not be arrested that night. They informed the defendant that he did not have to answer any questions that he did not want to. The officer denied making a deal with the defendant to release him that night in exchange for information.
B.R. Jeter of the Shreveport Police Department was with Officer Johnson when he talked with the defendant in the early morning hours of Saturday, August 12, *502 2000. According to Officer Jeter, the defendant was given his Miranda rights and asked if he wanted a lawyer and he said that he did not. The defendant was asked about the borrowed pick-up truck and he stated that he wanted to talk to his lawyer about that part. At trial, the defendant contended that he did not want to discuss with police who owned the gun. The police testified that the defendant initially said that the gun belonged to the victim. At trial, the defendant acknowledged that the gun was his.
However, the defendant expressed a willingness to discuss other matters without counsel. The defendant was allowed to call a friend, David Alford, who had previously been a police officer. He called Alford several times and posed a self-defense hypothetical. He asked Alford if he thought the police would release him based upon that scenario. Alford told the defendant numerous times to consult a lawyer. However, the defendant chose to continue talking to the police about some matters related to this crime. The defendant voluntarily gave a statement and took about 90 minutes composing the statement on Officer Jeter's computer.
Considering the entire record, and especially the testimony of several officers during the hearing on the defendant's motion to suppress, the state met its burden of proving beyond a reasonable doubt that the defendant's statement was freely and voluntarily given. The state established its heavy burden of proving that the defendant received his Miranda warnings twiceonce at the beginning of the custodial interview and a second time immediately preceding the defendant's typewritten statement. The state further proved that the statement was not the product of promises, threats or duress.
Officer Johnson testified that, although he told the defendant he could probably go home after giving a statement, at no time did he make any promises to the defendant, and at no time did he promise the defendant that he would never be arrested. Through Officer Johnson's testimony, the state proved that the defendant's mention of wanting to talk to an attorney regarding some aspects ended the interview, and an effort was made by the detectives to contact the defendant's attorney.
Officer Johnson testified that the defendant did not respond to the detectives' offer to retrieve his attorney. The defendant continued with the interview, and gave the typewritten statement, omitting the areas he wished to discuss first with his attorney. In fact, the defendant's own statement, which was introduced into evidence, contained the notation indicating that a part of the statement was omitted because he wished to discuss it with his attorney, and he was unable to contact his attorney through no fault of his own and "no fault of the detectives."
In this case, the defendant's limited invocation of his right to counsel was knowing and voluntary. The defendant understood his rights under Miranda and chose to invoke his right to counsel only with regard to limited details of the crime. The officers did not violate this limited invocation of the right to counsel. Further, the defendant freely chose to give his statement and to lead the officers to the body and the gun. The trial court did not err in denying the motion to suppress.

OTHER CRIMES EVIDENCE
The defendant argues that the trial court erred in allowing evidence of his involvement in another shooting in 1978 as evidence of other crimes under La. C.E. art. 404B. The defendant argues that evidence of the incident did not prove any fact genuinely at issue in the present case and was only introduced to show bad character. *503 He contends that the offense occurred many years ago and the officers only read from their police reports. They had no independent memory of the incident and did not use the reports to refresh their memories. Therefore, the defendant contends that the testimony regarding the 1978 shooting was improperly admitted. These arguments are without merit.
La. C.E. art. 404B provides in part:
Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other acts of misconduct is not admissible because it creates the risk that the defendant will be convicted of the present offense simply because the unrelated evidence establishes him or her as a "bad person." La. C.E. art. 404B(1); State v. Jackson, 625 So.2d 146, 148 (La.1993); State v. Fuller, 32,734 (La.App.2d Cir.12/17/99), 759 So.2d 104, writ denied, XXXX-XXXX (La.8/31/00), 766 So.2d 1273. This rule of exclusion stems from the "substantial risk of grave prejudice to the defendant" from the introduction of evidence regarding his or her unrelated criminal acts. State v. Prieur, 277 So.2d 126, 128 (La.1973). However, evidence of other crimes may be admissible if the state establishes an independent and relevant reason, i.e., to show motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding. La. C.E. art. 404B(1).
Even when the other crimes evidence is offered for a purpose allowed under Article 404, the evidence is not admissible unless it tends to prove a material fact at issue or to rebut a defense. The probative value of the extraneous crimes evidence must outweigh its prejudicial effect. La. C.E. art. 403; State v. Jacobs, 99-0991 (La.5/15/01), 803 So.2d 933, cert. denied, ___ U.S. ___, 122 S.Ct. 826, 151 L.Ed.2d 707 (2002); State v. Hatcher, 372 So.2d 1024, 1033 (La.1979). See also State v. Hills, 99-1750 (La.5/16/00), 761 So.2d 516; State v. McDermitt, 406 So.2d 195, 200 (La.1981).
All relevant evidence is generally admissible. La. C.E. 402. Relevant evidence is that which tends to show any fact of consequence to the charge. La. C.E. 401. Relevance of evidence is determined by the purpose for which it is offered. See State v. Freeman, 447 So.2d 1145 (La.App. 3rd Cir.1984), writ denied, 449 So.2d 1356 (La.1984). A trial judge is vested with wide discretion in determining relevance of evidence; his ruling will not be disturbed on appeal in the absence of a clear showing of abuse of discretion. State v. Miles, 402 So.2d 644 (La.1981).
Prior to trial, the state filed the appropriate notice of intent to use other crimes evidence and a pretrial hearing was held. The trial court found that the evidence was admissible. The state sought to introduce the facts connected with the 1978 incident to attack the defendant's credibility and to prove any purpose under La. C.E. art. *504 404B. In 1978, the defendant was involved in a shooting at the same house as the present offense. It was determined that the shooting in 1978 was in self-defense and the defendant was not charged. The state used the evidence of this occurrence to impeach the defendant's statements that nothing like this had ever happened to him before, that he panicked, that he did not trust the police, and that the present shooting was also self-defense.
It is arguable that the 1978 shooting incident involving the defendant at his Wagner Street house was not an "other crime, wrong, or act" within the contemplation of La. C.E. art. 404B. That is, the defendant was not charged, the victim was not killed, and the incident was resolved in the defendant's favorthe officers' testimony and the reports admitted into evidence show that the victim in that case was clearly shot in self-defense. Thus, the conclusion that the other incident established him as a "bad person" does not necessarily follow.
Not only was the prior shooting admissible to impeach the defendant's credibility, it was also probative of the defendant's intent, his knowledge, and the absence of mistake or accident. The trial court did not err in allowing this evidence because it was plainly relevant.
Further, the trial court did not err in allowing Officer Richard Mutter and Officer C.A. Lewis to testify from their 1978 police reports, even though they no longer have any memory of the incident. Regarding hearsay, La. C.E. 803 provides in pertinent part:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
. . . .
(5) Recorded recollection. A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence and received as an exhibit but may not itself be taken into the jury room. This exception is subject to the provisions of Article 612.
. . . .
(8) Public records and reports. (a) Records, reports, statements, or data compilations, in any form, of a public office or agency setting forth:
(i) Its regularly conducted and regularly recorded activities;
. . . .
(b) Except as specifically provided otherwise by legislation, the following are excluded from this exception to the hearsay rule:
(i) Investigative reports by police and other law enforcement personnel.
The defendant contends that the statements were inadmissible under La. C.E. art. 803(8)(b)(i). He also cites State v. Berkeley, 00-1900 (La.App. 5th Cir.5/31/01), 788 So.2d 647, writ denied, XXXX-XXXX (La.4/26/02), 814 So.2d 549, which found a police report to be inadmissible hearsay. In Berkeley, there was no indication that the officer who made the report was present to testify at trial. However, in that case, the admission of the report was found to be harmless error. In the present case, Officers Mutter and Lewis were present and testified at trial. They admitted having insufficient recollection of the 1978 incident to testify fully and accurately. Then, each officer used his report, which was shown to have been made by him when the matter was fresh in his memory and was shown to reflect that *505 knowledge correctly. This use of the report is an exception to the hearsay rule under La. C.E. art. 803(5) as a recollection recorded.[3] The trial court correctly found that the reports and testimony were admissible.

RELATIONSHIP WITH CHILDREN
The defendant urges that the trial court erred in denying him the opportunity to question certain witnesses concerning his close relationship with his children. La. C.E. 404A allows character evidence of an accused only to show those moral qualities pertinent to the crime with which the accused is charged. The defendant contends that he was not offering his evidence to prove a character trait, but to corroborate his statements that his children were dear to him and that his concern over losing them led him to conceal the offense. The defendant contends that his reason for concealing the offense was a significant and integral part of his defense. By prohibiting this evidence, he claims that he was denied the right to present relevant evidence in his defense. This argument is without merit.
The defendant did present evidence to the jury to show his close and loving relationship with his children. The defendant presented an exhibit picturing his involvement with his children in water sports, school activities, and home life. The defendant was allowed to present evidence that would support his claim that he was concerned about the custody and well-being of his children and his contention that this concern motivated his actions. While some evidence of the defendant being a good and doting parent to his children was presented, the trial judge did not permit the defendant to elaborate on specific examples of his parenting as this character evidence was not admissible under La. C.E. art. 404.
Regarding character evidence, La. C.E. art. 404 provides in part:
A. Character evidence generally. Evidence of a person's character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
(1) Character of accused. Evidence of a pertinent trait of his character, such as a moral quality, offered by an accused, or by the prosecution to rebut the character evidence; provided that such evidence shall be restricted to showing those moral qualities pertinent to the crime with which he is charged, and that character evidence cannot destroy conclusive evidence of guilt.
La. C.E. art. 405A states in part that, except as provided in Article 412, in all cases in which evidence of character or a trait of character of a person is admissible, proof may be made by testimony as to general reputation only. This evidentiary rule is stated by the court in State v. Harmon, 448 So.2d 264 (La.App. 3rd Cir. 1984), writ denied, 450 So.2d 953 (La. 1984): "Character evidence is established by general reputation, not by specific acts."
The trial court did not err in refusing to allow witnesses to testify regarding the defendant's relationship with his children. Such evidence was properly disallowed because it did not fall under the exception set forth under La. C.E. 404A(1), regarding character evidence of the accused, showing those moral qualities pertinent to the crime with which he is charged. The trial court allowed the defense to introduce *506 some general character evidence established by general reputation and which supported his defense that he acted out of concern for his children. La. C.E. 405A. The trial court did not err in refusing to allow attempts by the defense to introduce character evidence by specific acts.

CONCEALMENT OF EVIDENCE
The defendant argues that the trial court erred in allowing introduction of the defendant's actions after he shot the victim and by granting the state's request for a special jury instruction on concealment of evidence. This argument is without merit.
The court shall charge the jury as to the law applicable to the case. La.C.Cr.P. art. 802. It is well settled that evidence of flight, concealment, and attempt to avoid apprehension indicates consciousness of guilt. See State v. Thompson, supra; State v. Hudson, supra; State v. Schmidt, 99-1412 (La.App. 3d Cir.7/26/00), 771 So.2d 131, writ denied, 2000-2950 (La.9/28/01), 798 So.2d 105, cert. denied, ___ U.S. ___, 122 S.Ct. 1205, 152 L.Ed.2d 143 (2002); State v. Hamilton, 99-523 (La.App. 3d Cir.11/3/99), 747 So.2d 164.
In the present case, the defendant objected to introduction of evidence of his extensive measures to dispose of the victim's body and to conceal this crime. He objected to evidence that he slit the victim's throat, put the body in a shed behind the house, poured septic bacteria, water, and sugar on the body to aid decomposition, transported the body to a rural area, hid the gun and burned the victim's clothing. Although the defendant recognized the relevance of the evidence, he argues that its highly prejudicial nature outweighed any probative value.
A review of the record reveals that the defendant's actions subsequent to shooting the victim were relevant because they tended to show facts of consequence to the charged offense. The defendant claimed that the shooting was in self-defense, and he therefore put at issue his state of mind at the time of the crime. The evidence was relevant because it showed consciousness of guilt. The record shows that the trial court did not err in determining that the probative value of the evidence of the defendant's actions outweighed the prejudicial effect. The contested evidence is comparable to gruesome autopsy and crime scene photographs, necessary to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of the victim.[4] See State v. Letulier, 97-1360 (La.7/8/98), 750 So.2d 784, and cases cited therein. Therefore, the record does not show that the trial court abused its wide discretion in finding this evidence to be relevant and allowing it to be admitted into evidence.
Further, the trial court did not err in giving the jury instruction as to evidence of concealment. The trial court gave the following instruction: "Evidence of concealment and attempts to avoid apprehension are relevant as indications of conscious guilt." This is a correct recitation of the law applicable to the case. Therefore, the trial court did not err in giving the instruction to the jury.

*507 PRIOR INCONSISTENT STATEMENT
The defendant argues that the trial court erred in failing to allow him to call as a witness an investigator with the district attorney's office to testify concerning a prior inconsistent statement made to him by the state's forensic expert. This argument is without merit.
According to the defendant, the district attorney's investigator interviewed Dr. Ross, who performed the autopsy on the victim, approximately three weeks after the autopsy. At that time, she allegedly told the investigator that she could not say whether the victim was alive or dead when his throat was cut. Dr. Ross did not appear at the trial, but testified by video deposition. She stated in her deposition that the victim was alive at the time his throat was cut. At trial, the defendant sought to introduce the testimony of the investigator.
Under La. C.E. art. 613, extrinsic evidence of a prior inconsistent statement is admissible after the proponent has first fairly directed the witness' attention to the statement, and the witness had been given the opportunity to admit the fact and has failed distinctly to do so. Because Dr. Ross was not present to be questioned about her alleged prior inconsistent statement, the trial court refused to allow the investigator to testify.
We note that the defense called Dr. DiMaio who testified extensively in rebuttal to Dr. Ross' opinion that the victim was still alive when his throat was cut. Therefore, even though the defendant may not have had an opportunity to impeach Dr. Ross, it presented ample testimony in rebuttal to her opinion.
The defendant also argues that his counsel was ineffective for failing to ask Dr. Ross about her prior statement at the time the deposition was taken. A claim of ineffectiveness of counsel is analyzed under the two-prong test developed by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To establish that his attorney was ineffective, the defendant must show (1) that counsel's performance was deficient, and (2) that counsel's deficient performance prejudiced his defense. To establish the deficiency prong of the test, the defendant must show that counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Constitution. To establish prejudice, the defendant must show that, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the trial would have been different. Strickland v. Washington, supra; State v. Willis, 36,198 (La.App.2d Cir.8/14/02) 823 So.2d 1072.
A claim of ineffective assistance of counsel is most appropriately addressed through an application for post conviction relief rather than direct appeal, so as to afford the parties an adequate record for review. State v. Truitt, 500 So.2d 355 (La.1987); State v. Nash, 36,038 (La. App.2d Cir.6/14/02), 821 So.2d 678. The rationale behind such procedure is that a full evidentiary hearing may be conducted to explore the issue. State v. Watson, XXXX-XXXX (La.5/14/02), 817 So.2d 81. In the present case, the claim of ineffective assistance of counsel was not raised in an assignment of error and the record is not sufficient to consider the claim. Therefore, we pretermit a discussion of the defendant's claim of ineffective assistance of counsel.

GRAND JURY INDICTMENT
The defendant argues that the grand jury indictment is fatally defective because it is not signed by the foreperson of the *508 jury or endorsed a "true bill." This argument is without merit.
The record shows that the grand jury indictment was signed by the grand jury foreperson and was endorsed a "true bill" on the back of the document in full compliance with the requirements of La. C.Cr.P. art. 383. The defendant's argument to the contrary is unfounded.

CONCLUSION
For the reasons stated above, we affirm the conviction and sentence of the defendant, Michael Lewis Murray.
AFFIRMED.
NOTES
[1] The second subsection of the second degree murder statute includes a killing without intent when the offender is engaged in enumerated felonies. Since the facts support a finding of second degree murder under the intent to kill or inflict great bodily harm portion of the statute, we pretermit any discussion of the felony-murder subsection.
[2] Dr. Vincent DiMaio testified on behalf of the defendant that there was no way to tell if the victim was alive when his throat was cut.
[3] We note that the defendant, in his testimony at trial, fully set forth the circumstances of the shooting in 1978. The officers' reports corresponded with the defendant's testimony.
[4] Although the state admitted into evidence photographs of the victim's decomposed body, they were not published to the jury. The jury was given the option to view the photos upon request when they retired for deliberations. After beginning deliberations, the jury asked to view the photographs and the defendant renewed his objection to the admissibility. Before the trial court could rule, and before the photographs were viewed, the jury returned its verdict.