978 So.2d 1218 (2008)
STATE of Louisiana, Appellee,
v.
Gary Lamond GIBSON, Appellant.
No. 43,146-KA.
Court of Appeal of Louisiana, Second Circuit.
March 19, 2008.
*1219 Peggy J. Sullivan, Louisiana Appellate Project, for Appellant.
Robert W. Levy, District Attorney, A. Shawn Alford, Assistant District Attorney, for Appellee.
Before BROWN, GASKINS, and LOLLEY, JJ.
BROWN, Chief Judge.
Defendant, Gary Lamond Gibson, was convicted of second degree murder, a violation of La. R.S. 14:30.1, and sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant has appealed, urging insufficiency of the evidence. We affirm defendant's conviction and sentence.

Discussion
The grand jury indictment states that on April 14, 2005, defendant, Gary Lamond Gibson, committed the second degree murder of Freddrick Gray. At trial and on appeal, defendant claims that the evidence was not sufficient to prove beyond a reasonable doubt that he shot Freddrick Gray. At trial defendant's counsel argued that the detective "simply relied on these two witnesses (Latonya Simmons and Marco Aaron) and to say that (defendant) came in this house and brutally murdered Freddrick Gray. One of them (the two eye-witnesses) could have brutally murdered Freddrick Gray and made the story up."
In brief defendant argues:
The evidence was insufficient to sustain the conviction for at least three reasons. First, there was conflicting testimony as to whether or not Mr. Gibson had a bandage on his right hand which would have prevented him from firing a gun. Second, the only two witnesses to the *1220 crime had conflicting accounts of where they were when the crime occurred. Third, there was a total lack of any physical, tangible evidence linking Mr. Gibson to the crime.
Testimony
Detective Trey Fulton testified that on April 14, 2005, he made contact with defendant in the interview room at Det. Fulton's office and explained defendant's constitutional rights to him with the aid of a Miranda rights form. According to Det. Fulton, defendant asked for a lawyer and refused to sign the form. Det. Fulton did not ask defendant any more questions, but when Det. Fulton told defendant that he was under arrest for the second degree murder of Freddrick Gray,[1] defendant asked how it could be murder when he was defending himself.
Latonya Simmons testified that she and defendant had a child together, but that she had broken up with him in 2005 and had been seeing Freddrick Gray since that time. Latonya indicated that defendant was jealous of her relationship with Gray that had been ongoing for a year and a half prior to the date of the shooting, April 14, 2005. Latonya stated that she also had a four-month-old son with Gray. Although she and Gray were not married, they had planned to wed and had obtained a marriage license.
Latonya related that on the day of the shooting, Gray had picked her up from work and had taken her to her mother's house where she and Gray were also living. Defendant tried to call Latonya, but she let the phone ring because she did not want to talk to him. Later, defendant called, and Gray answered and indicated to defendant that Latonya was not at home. According to Latonya, she and her stepfather were in the kitchen and Gray was in Latonya's brother's room playing a video game when defendant came into the house armed with a gun. Defendant was looking for Gray; he looked in the bedrooms and did not see Gray at first, but when he overheard Gray call out to Latonya to ask her what was wrong, defendant went into the bedroom where Gray was, pointed the gun at him and fired. Latonya testified that she saw the fire from the gun and that defendant fired four shots. Defendant then threatened Latonya's stepfather, who ran into Latonya's mother's room and locked the door. Defendant tried unsuccessfully to kick the door down, then saw Gray walking, holding his left arm, trying to get out of the house. Defendant snatched the phone that Latonya was dialing, threw it across the room and shot at Gray again. Gray went outside and fell off the front porch. Defendant then drove away in Latonya's car. Gray died at the scene.
On cross-examination, Latonya admitted being in jail twice for theft. Defense counsel went over the events of April 14, 2005, using a diagram of the home prepared by the state. Defendant's attorney was able to point out some minor inconsistencies between Latonya's testimony and statements she had made to police approximately two years earlier. Latonya testified that she and her stepfather were standing at a table when defendant entered; she denied telling Officer Trey Fulton after the incident that she and her stepfather were sitting at the bar. Latonya denied remembering defendant having a bandage or cast on his right hand, the hand in which Latonya said that defendant *1221 had held the gun. On redirect, Latonya mentioned that defendant had been in jail when she left him, and defendant's counsel made a motion for a mistrial that was denied.
Marco Aaron testified that at the time of trial, he was serving time in Arkansas for "commercial burglaryprobation revocation." Aaron was 29 years old and was the stepfather of 22-year-old Latonya Simmons (he was married to Latonya's mother, who was 39). Aaron was present at the time of the shooting, and his testimony largely corroborated that of Latonya as to the events that transpired. Like Latonya, Aaron stated that he did not notice a bandage or cast on defendant's hand. However, unlike his stepdaughter, Aaron remembered that he and Latonya were seated at the bar in the house when defendant arrived. Aaron also remembered defendant firing five or six shots when he was in the bedroom and then maybe one or two more after that. However, Aaron admitted that he "didn't exactly count" the shots and he didn't know the exact number of shots fired.
Aaron also testified that he had run into his wife's bedroom and locked the door, but when defendant's attorney pointed out that Aaron had not told this to the police in his previous statement, Aaron responded, "It happened so fastI just told them what happened." Additionally, Aaron recounted a prior incident in which he and defendant had a "little fist fight" at the end of which defendant had pulled a gun on Aaron, shot at the ground a couple of times, and hit Aaron with the gun before running away.
Lieutenant Keith Blackman of the Union Parish Sheriff's Office assisted at the crime scene, and his testimony was used to introduce photographs of the crime scene, along with three spent .380 caliber shell casings and one unfired cartridge found at the scene. On cross-examination, Lt. Blackman admitted that no one dusted for fingerprints because, from the information supplied by witnesses, they [police] "knew who they were looking for." The weapon used was never found despite what Lt. Blackman characterized as a thorough search. When asked if he knew how many times the victim had been hit, Lt. Blackman responded that he knew of one time, and the officer indicated that based upon his observation, Gray was struck by that bullet while in the front bedroom.
Dr. Stephen Venters, the coroner of Union Parish, testified that on the day of the shooting, he examined Freddrick Gray's body and saw a single gunshot wound to the left arm. The body was then sent to a forensic pathologist who performed an autopsy. Over a defense objection, Dr. Venters opined that, based on the autopsy report, the cause of death was a gunshot wound through the left arm and into the chest that caused Gray to "bleed out."
Detective Trey Fulton of the Union Parish Sheriff's Office testified that he responded on the day of the shooting to a complaint of homicide, and, after talking to Latonya and Marco Aaron, he developed defendant as a suspect. Detective Fulton stated that defendant was taken into custody and read his rights. As he had done at the motion to suppress hearing, Det. Fulton testified that defendant indicated that he wanted a lawyer, but when told that he was under arrest for second degree murder, defendant asked, "How can that be murder? I was just defending myself." Det. Fulton testified that they had no other suspects but defendant, and that nothing in the investigation was inconsistent with defendant having committed the crime.
Officer Keith Blackman was recalled to the stand in order to introduce a few more crime scene photos, including some "perimeter *1222 shots." Again, Lt. Blackman indicated that the scene was thoroughly searched for the weapon, but he admitted on cross-examination that it was possible that a gun could have been hidden in the junk that was in the yard.
Chief Deputy Don McClanahan's testimony primarily focused on the search for the weapon at the crime scene, and added little to that of Keith Blackman. After Chief Deputy McClanahan testified, the state rested its case.
The defense began by recalling Marco Aaron to the witness stand. Aaron clarified that after the shooting, he called 911 and then ran down the street to a nearby police station. He also denied that he and his stepdaughter, Latonya Simmons, were lovers; he acknowledged the seven or eight-year age difference between them, however.
Next, the defense called Phyliss Gibson, defendant's mother, to the stand. Ms. Gibson testified that defendant and Latonya met in 2000 and were still seeing each other up until the time of the crime. Ms. Gibson stated that at the time of the crime, defendant had stitches in his right hand, which was bandaged. When asked if she was suggesting that defendant was unable to shoot Gray, she responded that his hand "was damaged so bad that he couldn't squeeze somesome (unintelligible)." Ms. Gibson testified that to the best of her knowledge her son did not own a pistol on April 14, 2005. She also testified that on the day of the shooting she had a phone conversation with Latonya Simmons and told her not to call back because, "(defendant) is upset and not thinking right, in his mind." When asked why defendant was upset, Ms. Gibson testified that he had been taking "them pills young folks be taking . . ." She also indicated that defendant was upset because when he was in El Dorado "somebody had jumped on him, and he was steady crying and complaining about that and he was talking about his hand was hurting, and I knew if he talked to [Latonya], he would have been more upset . . ." However, she then testified that defendant "should've been used to it, `cause that [Latonya] was constantly doing the same thing every day'" and that "seemed like whenever he did talk to her on the phone, she never made things better. It was always athey were always arguing onback and forth on the telephone, or whatever the case may be." Ms. Gibson also testified that Latonya still wanted to be defendant's girlfriend and was having sex with him, and that when Latonya would come to Ms. Gibson's house, she would bring her other boyfriend [Freddrick Gray] with her. After Ms. Gibson's testimony, the defense rested.
The last witness to testify was the state's rebuttal witness, Deputy Jerome McKenzie, whose testimony was used to explain the fact that the witnesses had thought the gun used in the crime was a 9 mm handgun when in fact it was a .380. Dy. McKenzie testified that he was familiar with handguns and that there was no difference in the size of the guns; he agreed that a layperson might not know whether a gun was a .380 or a 9 mm by looking at it.
Analysis
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 95-1377 (La.02/28/96), 668 So.2d 1132; State v. *1223 Murray, 36,137 (La.App. 2d Cir.08/29/02), 827 So.2d 488, writ denied, 02-2634 (La.09/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.02/22/06), 922 So.2d 517; State v. Robertson, 96-1048 (La.10/04/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.08/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422.
Second degree murder is defined in pertinent part as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. La. R.S. 14:30.1(A)(1). Thus, in the instant case, the state had to prove beyond a reasonable doubt that defendant had the specific intent to kill or inflict great bodily harm on Gray. Defendant simply denies that he was the one that shot Gray.
First, there is defendant's admission to police that he was the shooter, and it is not disputed that Gray died of a gunshot wound received at the crime scene. Second, there were two eyewitnesses, both of whom testified that defendant was the shooter; the witnesses' different recollection of their locations in the room when defendant entered armed with a pistol is not significant. A rational jury could have believed these witnesses, whose testimony was supported by that of the police officer to whom defendant admitted that he shot Gray in self-defense. At the same time, there was absolutely no evidence that defendant actually acted in self-defense. Instead, the evidence shows that defendant came to the house armed, looking for Freddrick Gray, whom defendant shot as soon as he located the victim. A rational jury also could have rejected the testimony of defendant's mother concerning defendant's allegedly injured hand. There was no corroboration of her testimony, neither of the witnesses remembered any bandage or cast on defendant's hand, and again defendant admitted being the shooter. Finally, in light of the evidence discussed above, it was of no moment that the gun used in the shooting was never recovered or that there was no DNA or fingerprint evidence linking defendant to the shooting.
A rational juror could have reasonably concluded that defendant was guilty as charged.

Conclusion
For the reasons set forth above, defendant's conviction and sentence are AFFIRMED.
NOTES
[1] Defendant filed a motion to suppress the statements which was heard and denied. Defendant also filed a motion to quash based on a speedy trial complaint which was also denied.