*679
 
 STEWART, J.
 

 11 Defendant, Dallas Taylor, was charged with one count of aggravated rape, one count of armed robbery, one count of possession of a firearm by a convicted felon, and one count of aggravated burglary. A unanimous jury found Taylor guilty as charged on all four counts. The trial court sentenced the defendant to serve the mandatory term of life imprisonment without the benefit of probation, parole, or suspension of sentence for the aggravated rape charge, thirty years at hard labor, to run consecutively, without the benefit of probation, parole, or suspension of sentence, for the armed robbery charge, twelve years at hard labor, to run concurrently, without the benefit of probation, parole, or suspension of sentence, for the possession of a firearm by a convicted felon charge, and fifteen years at hard labor, to run concurrently, on the aggravated burglary charge. Taylor now appeals, urging one assignment of error. For the reasons stated herein, we affirm the defendant’s convictions and sentences as amended.
 

 FACTS
 

 During the defendant’s jury trial, the following evidence was adduced.
 
 [1]
 
 On the morning of September 7, 2006, 84-year-old J.R. was cleaning inside her home when she heard a knock at the door. J.R.’s husband was not at home, so she went to the front door and saw a man whom she did not know. She said that the man said he was there to do some yard work; J.R. told the man that he would have to return when her husband was at home. The man left, but returned a while later and asked if her phusband had returned. She informed the man that her husband was not back yet and he needed to come back when her husband returned. He also asked if anyone else was at home. J.R. told him “no” and closed the door. She noticed that the man was driving a green pickup truck. The victim admitted that she was unsure as to whether she locked the door back. A Monroe city worker operating a tractor near the victim’s home saw the green truck driving by and saw that there was only one person in the truck.
 

 J.R. went back to work inside her home. As she was walking down her hallway, she heard someone coming inside the home and believed that it was her husband. As she turned around, she saw that the man who had asked her about the yard work had entered her home and was coming toward her. J.R. screamed, but the stranger told her to stop screaming or else he would kill her. The man put a pistol on J.R.’s neck, grabbed her by the hair and ordered her not to look at him. The man asked J.R. if she had a safe or any money in her house. J.R. retrieved $100 in cash from her purse in a front bedroom, and then the stranger forced J.R. into the master bedroom at the end of the hall.
 

 When they arrived at the master bedroom, the stranger ordered J.R. to take off all her clothing, lie on the bed, and spread her legs. The assailant then got on top of J.R. and raped her vaginally. He also forced his penis in her mouth and then raped her anally. After rummaging around on the victim’s dresser where she kept her jewelry, the attacker raped her again.
 

 Shortly before 10:00 a.m., a city worker from the beautification department observed the defendant leave the victim’s
 
 *680
 
 home in a green Dpickup truck. The defendant was the sole occupant of the truck. At approximately 10:00 a.m., the victim called 911 and the Monroe Police Department (“MPD”). When police arrived, the victim described her assailant as a black male with a stocky build wearing a white T-shirt, long shorts and white tennis shoes with a red design on them.
 

 Within a few minutes of the victim’s 911 call, the Monroe police searched the area around the victim’s home. A MPD officer, Sergeant Roderick Jackson, saw a truck matching the description given by the victim being driven by a black male wearing a white T-shirt. At 10:07 a.m., Jackson stopped the truck. The driver of the truck was the defendant, Dallas Taylor. Taylor was wearing a white shirt, long blue-jean shorts, and white tennis shoes with red bottoms. Taylor got out of the truck and approached the officer, but as the defendant heard the sirens of other MPD units arriving, the defendant ran away. The officers apprehended Taylor after a brief chase on foot.
 

 As he was being apprehended, Taylor dropped a checkbook belonging to the victim. A MPD officer, Detective Rhodes, searched Taylor and found $104.00 in cash and a spice jar containing dimes. Rhodes also found other items in Taylor’s right front pocket, which included $45.00 in cash, several rings, and pairs of earrings. These items belonged to either the victim or her husband. On the back seat of the defendant’s truck, the police found two rifles, a pistol and two boxes of ammunition belonging to the victim’s husband. After the defendant was arrested, two officers transported the defendant to the Monroe police station in a marked patrol car. On ^September 13, 2006, a MPD officer found a credit card holder under the back seat of the same patrol car that was used to transport the defendant. The credit card holder contained the victim’s driver’s license, credit cards, store loyalty cards, and other various identification cards.
 

 The police also searched the victim’s home for physical evidence. An investigator found a fingerprint on a little white jewelry box lid that was found on the master bedroom floor by the door. The fingerprint came from the defendant’s left thumb.
 

 At the police station, the defendant agreed to speak with police. Sergeant Heath and Sergeant Huggins interviewed the defendant. Before they revealed to him that his fingerprint had been found on an object in the house, the defendant admitted that he was in possession of stolen firearms, jewelry, and a checkbook, but denied any other wrongdoing and denied ever being in the victim’s home. The defendant claimed that he had bought the items from someone named “Steve” who had himself stolen the items. The defendant stated that earlier that morning, he was running an errand when he met with Steve, who told the defendant that he planned to “hit a lick uptown on the north side” and needed a ride afterward. The defendant agreed to meet Steve on the street where the victim lived, and the defendant said that when he located Steve on that street later, Steve was already in possession of the stolen items. The defendant said that he picked up Steve and bought the guns and jewelry from Steve before dropping Steve off at the shelter; he said that Steve retained the victim’s credit cards. After being ^confronted with the fingerprint evidence, the defendant vehemently maintained that he had not been inside the victim’s home.
 

 After this interview transpired, Detective Nappier and Detective Baw transported the defendant to a local hospital for forensic analysis of his body. A nurse
 
 *681
 
 used a swab to obtain potential serological evidence from the defendant’s penis. Additionally, the nurse used a comb on the defendant’s pubic hair. A long straight white hair was found on the defendant’s penis. When the defendant saw this hah’, he made a motion toward the hair, but he was ordered to stop. This ham was inconsistent with the defendant’s pubic hair.
 

 The victim was also examined at the hospital by Patti Taylor McFadden, who is a nurse specializing in sexual assault cases. McFadden described the victim’s pubic ham as long and white.
 

 After the defendant was transported back to the police station, Detective Heath and Detective Nappier interviewed him a second time. In this interview, the defendant admitted that he had been inside the victim’s home. However, he claimed that he went into the house after “Steve” went inside and denied that he was armed. The defendant said that Steve, who was wearing black tennis shoes, had taken the victim into the master bedroom of the house. The defendant informed the detectives that, while Steve was with the victim in the back bedroom, he found a pair of the victim’s panties on the hallway floor and used them to masturbate. The defendant said that he never saw the victim and never went into the master bedroom. He claimed that Steve was the only person in the master bedroom | ^with the victim and also was the person who took the jewelry. The defendant further explained that he and Steve discussed where to meet after the crime, and then Steve fled the house on foot while he drove away. The defendant admitted that he kept the victim’s checkbook, guns and jewelry but said that Steve kept the victim’s credit cards.
 

 J.R. picked two men out of a photo lineup that she described as similar in appearance to her attacker and who appeared to her to look similar to each other; the defendant was one of the men she picked. The city worker witness viewed a photo lineup and identified the defendant as the driver he saw leaving the victim’s home.
 

 Although technicians sampled and tested DNA evidence from the bodies of the defendant and the victim, the quantity of biological material present was insufficient to permit identification through currently available techniques. Troy Kendall Stra-cener, an employee with the North Louisiana Criminalistics Laboratory whose primary duty is DNA analysis, testified that the analysis of the sample from the defendant’s penis did reveal the presence of material from a person other than the defendant. He further testified that the white hair found on the defendant’s penis could not be linked to the victim through DNA analysis because no DNA profile could be obtained from the hair. Stracener reported that this complication is common when analyzing grey hair.
 

 The defendant’s former fiance, Lashon-da Hill, testified that she had been with the defendant on the morning of these events until sometime after 9:00 a.m., when the defendant left her mother’s home. The defendant’s |7current fiance, Teshetta Mock, testified that the defendant picked her up from her father’s house at approximately 9:30 a.m. and took her to the food stamp office. She said that the defendant dropped her off at approximately 9:45 a.m. Mock alleges that she changed her mind about applying for food stamps after filling out an application. After informing a food stamp office employee that she changed her mind, Mock left. She testified that her application was not processed. The food stamp office has no record of her visit on September 7, 2006.
 

 On February 14, the jury unanimously convicted the defendant of aggravated rape, armed robbery, aggravated burglary
 
 *682
 
 and possession of a firearm by a convicted felon. The trial court imposed a mandatory term of life imprisonment without the benefit of .probation, parole, or suspension of sentence for the aggravated rape charge. For the armed robbery charge, the trial court sentenced the defendant to serve 30 years’ imprisonment, without the benefit of probation, parole, or suspension of sentence. For the aggravated burglary charge, the trial court sentenced the defendant to serve 15 years’ imprisonment at hard labor, with credit for time served. For possession of a firearm by a convicted felon, the court sentenced the defendant to serve 12 years’ imprisonment at hard labor, without the benefit of probation, parole, or suspension of sentence, and fined the defendant $1,000, in default of which he must serve 60 days in jail. The trial court ordered all of these sentences to run concurrently except for the armed robbery sentence, which the court imposed consecutively to the other terms. Taylor now appeals.
 

 |SLAW AND DISCUSSION
 

 In the defendant’s sole assignment of error, he argues that the evidence was not sufficient to convict him of the charges of aggravated rape and armed robbery, or of any other verdict responsive thereto. More specifically, the defendant urges that the state failed to prove that he was the person who committed these offenses.
 

 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979);
 
 State v. Tate,
 
 2001-1658 (La.5/20/03), 851 So.2d 921,
 
 cert. denied,
 
 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004);
 
 State v. Cummings,
 
 95-1377 (La.2/28/96), 668 So.2d 1132;
 
 State v. Murray,
 
 36,137 (La.App. 2d Cir.8/29/02), 827 So.2d 488,
 
 writ denied,
 
 2002-2634 (La.9/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder.
 
 State v. Pigford,
 
 2005-0477 (La.2/22/06), 922 So.2d 517;
 
 State v. Robertson,
 
 96-1048 (La.10/4/96), 680 So.2d 1165. The appellate court does not assess the credibility of witnesses or reweigh evidence.
 
 State v. Smith,
 
 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in 13part.
 
 State v. Gilliam,
 
 36,118 (La.App. 2d Cir.8/30/02), 827 So.2d 508,
 
 writ denied,
 
 2002-3090 (La.11/14/03), 858 So.2d 422.
 

 The
 
 Jackson
 
 standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime.
 
 State v. Sutton,
 
 436 So.2d 471 (La.1983);
 
 State v. Parker,
 
 42,311 (La.App. 2d Cir.8/15/07), 963 So.2d 497;
 
 State v. Owens,
 
 30,903 (La.App. 2d Cir.9/25/98), 719 So.2d 610,
 
 writ denied,
 
 98-2723 (La.2/5/99), 737 So.2d 747.
 

 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is
 
 *683
 
 one of the weight of the evidence, not its sufficiency.
 
 State v. Allen,
 
 36,180 (La. App.2d Cir.9/18/02), 828 So.2d 622,
 
 writs denied,
 
 2002-2595 (La.3/28/03), 840 So.2d 566, 2002-2997 (La.6/27/03), 847 So.2d 1255,
 
 cert. denied,
 
 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
 

 In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion.
 
 State v. Wiltcher,
 
 _|_10 41,981 (La.App. 2d Cir.5/9/07), 956 So.2d 769;
 
 State v. Burd,
 
 40,480 (La.App. 2d Cir.1/27/06), 921 So.2d 219,
 
 writ denied,
 
 2006-1083 (La.11/9/06), 941 So.2d 35. This rule is applicable to the testimony of victims of sexual assault.
 
 State v. Robinson,
 
 36,147 (La.App. 2d Cir.12/11/02), 833 So.2d 1207;
 
 State v. Ponsell,
 
 33,543 (La.App. 2d Cir.8/23/00), 766 So.2d 678,
 
 writ denied,
 
 2000-2726 (La.10/12/01), 799 So.2d 490.
 
 See also State v. Simpson,
 
 39,268 (La.App. 2d Cir.1/26/05), 892 So.2d 694. Indeed, such testimony alone is sufficient even where the state does not introduce medical, scientific, or physical evidence to prove the commission of the offense by the defendant.
 
 State v. Robinson, supra; State v. Ponsell, supra.
 
 See also
 
 State v. Johnson,
 
 96-0950 (La.App. 4th Cir.8/20/97), 706 So.2d 468,
 
 writ denied,
 
 1998-0617 (La.7/2/98), 724 So.2d 203,
 
 cert. denied,
 
 525 U.S. 1152, 119 S.Ct. 1054, 143 L.Ed.2d 60 (1999).
 

 When the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentifieation.
 
 State v. Hughes,
 
 2005-0992 (La.11/29/06), 943 So.2d 1047;
 
 State v. Weary,
 
 03-3067 (La.4/24/06), 931 So.2d 297. Fingerprint evidence has been upheld as sufficient to sustain a conviction.
 
 State v. Lee,
 
 39,969 (La.App. 2d Cir.8/17/05), 909 So.2d 672,
 
 writ denied,
 
 2006-0247 (La.9/1/06), 936 So.2d 195;
 
 State v. Grissom,
 
 467 So.2d 858 (La.App. 2d Cir.1985).
 

 In his second police interview, the defendant admitted to the police that he had gone into the victim’s home and stolen firearms and ammunition. He also claimed to have masturbated with the victim’s panties. I^However, he told police that he never saw the victim or went into her bedroom. He said that another man, Steve, was the only person with the victim in her bedroom. The question on appeal is whether the state proved beyond a reasonable doubt that the defendant, rather than some other person, was the perpetrator of the rape.
 

 In her testimony, the victim described only a single assailant. She said that the man who attacked her had twice come to her door that morning asking about yard work. She explained that as she walked down the hallway of her home, she heard a sound, turned around and saw that “it was him,” the man who had asked her about yard work. She testified that this was the man who raped her and, during the course of the rape, rummaged through the jewelry on the top of her bedroom dresser. Although the defendant claimed never to have entered the victim’s bedroom, his fingerprint and no one else’s was found on the lid of the little white jewelry box, which was found by the door of the master bedroom where the rape occurred. As the victim described the events of that morning, she recalled only one armed man who entered her house, took her property and raped her.
 

 The victim saw and described the defendant’s truck. A city worker likewise saw that same truck hurriedly leaving the victim’s house. The city worker positively identified the defendant as the driver and sole occupant of the truck, and the worker
 
 *684
 
 saw no one else at the scene. It is undisputed that the defendant was in possession of a wide variety of the victim’s belongings. He told police that his purported accomplice, Steve, had kept |12the victim’s credit cards, but those cards were later found in the patrol car used to transport the defendant to jail. The defendant’s alibi witnesses did not testify that they were with him at the time when these events took place, and there is no record of Ms. Mock ever having been at the food stamp office on the morning of the rape as the witness claimed.
 

 The victim testified that her attacker was a black male of medium height and medium weight; the defendant is a black male who is 5 feet 9 inches tall and heavyset. The victim initially described her rapist as a stocky black male. In addition, the victim said that the man was wearing a white T-shirt, long shorts and white tennis shoes with a red design; photos of the defendant taken at the time of his arrest show that this description was entirely accurate.
 

 The DNA evidence in this case neither links the defendant to the rape nor excludes the defendant as the perpetrator. However, a long white hair was found on the defendant’s penis shortly after the rape, and this hair had similar characteristics to the victim’s pubic hair as described by the nurse who examined the victim. The defendant explained to police his belief that the hair might have come from the victim’s panties when he used the underwear to masturbate, but the plausibility of that story was for the jury to decide.
 

 Considering the testimony and evidence presented, we can determine that the direct evidence when viewed in the light most favorable to the state was sufficient to establish that the defendant was the perpetrator of the rape, robbery, burglary and possession of firearms by a convicted felon. All of | ,sthe evidence, particularly the fingerprint evidence, proved that the defendant and only the defendant was the perpetrator of the rape, robbery, burglary and possession of firearms by a convicted felon. The defendant’s fingerprint was found in the victim’s bedroom. Additionally, the victim and the city worker described the defendant when they described the man who was present at the victim’s house on the morning of the crimes. There is no reasonable probability of mis-identification in this case. The state proved beyond a reasonable doubt that the defendant was the person who committed these crimes.
 

 ERROR PATENT
 

 We observe that the trial court fined the defendant $1,000 on the felon with a firearm conviction, in default of which the defendant would serve an additional 60 days in jail. An indigent defendant may not be subjected to imprisonment because he is unable to pay a fine which is part of his sentence.
 
 Bearden v. Georgia,
 
 461 U.S. 660, 103 S.Ct. 2064, 76 L.Ed.2d 221 (1983);
 
 State v. Monson,
 
 576 So.2d 517 (La.1991);
 
 State v. Kerrigan,
 
 27,846 (La.App. 2d Cir.4/3/96), 671 So.2d 1242. A defendant’s claim of indigence in such a situation may be discerned from the record.
 
 State v. Conway,
 
 604 So.2d 205 (La.App. 2d Cir.1992);
 
 State v. Williams,
 
 484 So.2d 662 (La.1986). The record indicates that the defendant is indigent, as he is represented on appeal by the Louisiana Appellate Project. Therefore, we vacate the portion of the sentence providing for additional jail time in the event of default of payment of the fine amounting to $1,000, relating to the felon with a firearm conviction.
 

 |„,CONCLUSION
 

 The defendant’s convictions are affirmed. We vacate the portion of the sen
 
 *685
 
 tence providing for additional jail time in the event of default of payment of the fine and affirm the sentences as amended.
 

 AFFIRMED AS AMENDED.
 

 [1]
 

 . Due to the victim's poor health and impending move out of state, she was unable to appear at the trial. However, by stipulation of the state and the defendant, the victim's video recorded testimony was played for the jury. The victim was subject to cross-examination by the defendant’s attorney.