LOLLEY, J.
|2This writ of supervisory review arises from the Sixth Judicial District Court, East Carroll Parish, Louisiana. Joe A. Davis was convicted of misdemeanor simple battery, a violation of La. R.S. 14:35, and sentenced to 60 days in the parish jail. The defendant now seeks review of his conviction and sentence, which, for the following reasons, we affirm.
Facts
According to the testimony elicited during the trial, the defendant, Joe A. Davis, was a school bus driver working for the East Carroll Parish School Board transporting students to and from Monticello High School. Davis worked as a bus driver for many years and quite frequently would stay around the school after dropping students off in the mornings.
The victim, J.S., alleged that on October 23, 2008, she was standing behind Davis in the cafeteria line waiting for her meal. Davis was also waiting and talking to one of the cafeteria workers. Davis placed his hand on J.S’s thigh where he held it until she pushed his hand away. That same day J.S. was checked out of school early for a doctor’s appointment. She went to her aunt’s vehicle to wait while other siblings and relatives were also checked out of school. As J.S. waited at the vehicle, she saw Davis and he began to make gestures towards her indicating the length and circumference of his penis while saying, “This is how big my d-is and how round it is.” |3 According to J.S., the defendant also asked her if she could handle it. J.S. asked the defendant why he did not “go do that to his wife.” J.S. claimed that Davis replied he wanted her. Immediately following this exchange, the victim’s aunt arrived at the vehicle and they left.
It was several days later, October 27, 2008, when J.S. reported to Florice Coleman, a teacher at the school, of Davis’ actions towards her. Mrs. Coleman in turn took J.S. to the principal to report the incident. At that point, the principal began an investigation which was followed up by investigations conducted by the school superintendent’s office as well as the East Carroll Parish Sheriffs Office. Davis was arrested and charged with simple battery and contributing to the delinquency of a minor.
Following a bench trial, Davis was found guilty of simple battery and not guilty of *1069 contributing to the delinquency of a minor. He was sentenced to serve 60 days in jail with credit for time served. We are now considering his writ of supervisory review.
Discussion
Davis’ counsel and Davis both bring assignments of error related to the sufficiency of the evidence, arguing that the evidence was insufficient to convict. Further, Davis’ counsel also argues that the trial court failed to apply the proper legal standard of presumption of innocence and burden of proof when convicting Davis of simple battery. We disagree.
 The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); State v. Tate, 2001-1658 (La.05/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Cummings, 1995-1377 (La.02/28/96), 668 So.2d 1132; State v. Murray, 36, 137 (La.App.2d Cir.08/29/02), 827 So.2d 488, writ denied, 2002-2634 (La.09/05/03), 852 So.2d 1020. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 2005-0477 (La.02/22/06), 922 So.2d 517.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 1994-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to the fact-finder’s decision to accept or reject the testimony of a witness in whole or in part. State v. Bowie, 43,374 (La.App.2d Cir.09/24/08), 997 So.2d 36, writ denied, 2008-2639 (La.05/22/09), 9 So.3d 141.
 Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Ashley, 44,861 (La. App.2d Cir.10/28/09), 26 So.3d 193. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Wiltcher, 41,981 (La.App.2d Cir.05/09/07), 956 So.2d 769.
 An appellate court reviewing the sufficiency of the evidence must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus |sviewed, the- facts established by the direct evidence and inferred from the circumstantial evidence must be sufficient for a rational juror to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Jacobs, 504 So.2d 817 (La.1987); State v. Adkins, 39,724 (La.App.2d Cir.06/29/05), 907 So.2d 232, writ denied, 2006-2514 (La.05/04/07), 956 So.2d 607.
Louisiana R.S. 14:35 provides that a simple battery is' a battery committed without the consent of the victim. Battery is defined as the intentional use of force or violence upon the person of another or the intentional administration. of a poison or other noxious liquid or substance to another. La. R.S. 14:33. Whoever commits a simple battery shall be fined not more than $1,000.00 or imprisoned for not more than six months, or both. La. R.S. 14:35.
In its oral reasons for judgment following the trial; the trial court noted that this *1070 case was about credibility. Whereas there were several witnesses called at the trial, there were no witnesses to the incidents other than J.S. and Davis, both of whom testified at his trial.
J.S. testified that she was an eighth grade student at Monticello High School in October 2008 when she began to feel “weird” around Davis as she noticed him staring and winking at her. As evidenced by testimony at trial, it was not unusual for Davis to have brief conversations with the students at the school, but J.S. noticed that he acted differently around her. J.S. testified she initially did not pay much attention to the defendant’s actions, but “it just made me feel uncomfortable really.” According to J.S., Davis’s attention to her began about a week before the October 23rd incidents.
|fiOn October 23, J.S. recalled being in the school lunchroom waiting in line to get her lunch. Davis was standing in front of her talking to a cafeteria worker. According to J.S., Davis reached down and grabbed her leg on her thigh. J.S. pushed his hand away from her leg then walked past him to get her lunch. According to J.S., Davis did not say anything to her, but continued to talk with the cafeteria worker. J.S. did not recall who the cafeteria worker was, and she did not believe that anyone saw what Davis had done because they were standing in front of the railing used to hold trays. J.S. testified that Davis reached under the railing to touch her thigh.
J.S. further testified that later that day another student, Dexter Davis, approached her during her P.E. hour and asked for her address while holding paper and a pen. He told J.S. he wanted to send her a senior picture. J.S. declined to give him her address, and then she saw him put down the paper and walk over to Davis to return the pen. J.S. testified she could clearly see Davis.
Shortly after this, J.S. was told she was being checked out for a doctor’s appointment. Her aunt, who had come to check her out, told her to go to the vehicle and wait. While walking to the truck, J.S. saw Davis, and he asked her why she had not given him her address so he could visit her at night. J.S. replied that she did not want Davis to visit. J.S. continued to walk to the truck as the defendant walked away. J.S. recounted that Davis then turned around standing about 100 feet from J.S. and made gestures showing J.S. the length and circumference of his penis. According to J.S., Davis asked her if she could handle it (referring to his penis). J.S. stated she turned away and asked the defendant “why don’t [you] go do that to [your] wife.” She testified that Davis replied, “No, I want yours.” J.S.’s aunt |7walked up to the truck shortly thereafter, but she did not hear Davis’s remarks.
J.S. testified that she specifically recalled the date of the incidents, because she remembered being checked out of school to go to the doctor. She did not attend school the next day and had to return to the doctor because of a sprained ankle. When J.S. went back to school on October 27, she was helping a teacher, Mrs. Coleman, in her classroom. Because she trusted Mrs. Coleman, J.S. confided in her about the events that occurred the week before. Mrs. Coleman took J.S. to the office where she told Flora Watson, the school principal, what occurred. Mrs. Watson had J.S. write a statement about the incidents.
J.S. testified that she waited before reporting the incidents because she was scared, anxious, and nervous. She did not believe anyone would believe a child over an adult. J.S. also told her story to Elizabeth Brice, an assistant principal at the *1071 school, because Mrs. Brice saw her in Mrs. Coleman’s room and wanted to know why she was there. J.S. initially told Mrs. Brice she was there for personal reasons, but Mrs. Brice continued to question her so she eventually told her what happened. Mrs. Brice responded to J.S. that she believed Davis could do that.
In his own defense, Davis also testified. He noted that he had been employed as a bus driver for the East Carroll Parish School Board since 1995. He stated he had been a “fixture” around Monticello High School for about 10 years, and he claimed to have never been told he could not remain on campus after completing his bus routes. Davis denied knowing J.S. other | Rthan having seen her in court, and he testified as only having a vague idea who J.S. was prior to the first court hearing.
Davis testified that he did not have any independent recollection of the events and recited his normal routine which included doing his bus routes, then going to eat lunch and later playing basketball in the gym or sleeping in the gym, working on a computer in the agricultural shop or working on his bus. Davis denied touching J.S. while she was in the lunch line and even denied entering the . cafeteria line. The defendant also denied having any conversation with J.S. in the parking area, and he believed cameras would have recorded that activity if it had in fact occurred. Davis denied asking his nephew to get a telephone number or address from anyone. Davis claimed that all the witnesses were lying during their testimony and he had not done any of the things alleged by the witnesses.
Officer Brandon Wiltcher of the East Carroll Sheriffs Office also testified at the trial. Officer Wiltcher investigated the complaint that was called in on October 23, 2008, by Shawn Mercer, J.S.’s uncle. After speaking to Mercer, Off. Wiltcher had a deputy go to Mercer to take an official complaint.. According to Off. Wiltcher, J.S. and Mercer reported that J.S. was approached by Davis and that he made some sexual gestures toward the child and touched her inappropriately. J.S. also explained how she noticed Davis staring at her at school earlier during the week, which made her uncomfortable, J.S. also related to Off. Wiltcher that Davis asked Veronica Ellerby, the victim’s cousin and best friend, for J.S.’s address and telephone number. She also described to the officer how Dexter Davis had asked her for her home address.
|flThe next day, October 24, 2008, Off. Wiltcher took official statements from J.S. and the incident was reported to the school principal and several teachers. Officer Wiltcher testified that he found little discrepancy in the statements gathered by the school board and the statements he took from the same individuals. According to Off. Wiltcher, J.S. was also interviewed at the Children’s Advocacy Center in Monroe by a child psychologist and again provided a statement that was consistent with the others she had given him and later, school officials. Based on the statements made by J.S., Off. Wiltcher obtained a warrant for Davis’s arrest, who was subsequently arrested and charged with contributing to the delinquency of a juvenile and simple battery.
Alice Nicholls, a supervisor with child welfare attendance for the school district, also testified. Nicholls explained that she conducted an investigation into the allegations on behalf of the superintendent. During her investigation, Nicholls interviewed Dexter Davis, Veronica Ellerby, and J.S.
Dexter Davis indicated to Nicholls that he did not have any information about the incidents and did not want to answer ques *1072 tions. Dexter Davis provided Nicholls with a written statement of the same facts claiming that he did not “have any idea if Joe was supposed to be getting J.S.’s number or address.”
Veronica Ellerby informed Nicholls that Davis had asked for J.S.’s telephone number on one or two occasions sometime in October; however, Veronica did not give him that information. Veronica indicated she later learned from the victim that the defendant wanted the victim’s address and telephone number because he wanted to visit J.S. at home.
ImWhen Nicholls interviewed the victim, J.S. reported that she was in P.E. class when Dexter came over to her with a pen and paper asking for her address, but she refused to give it to him. J.S. saw Dexter walk' over to an area where she saw the top of Davis’s head. Nicholls testified J.S. reported that she did not actually see Dexter give the pen and paper to Davis, and then Davis left the gym at that time.
Veronica Ellerby testified at the trial as well. Veronica was also a student at Monticello High School in 2008, and she had known the defendant for some time. In fact, Veronica was a friend of J.S. and they later found out they were related. According to Veronica, sometime in October 2008, Davis asked Veronica for J.S.’s telephone number on at least three occasions. Although Veronica testified she was not completely certain of the dates, she knew it could have happened around October 9 and twice toward the end of the month. Veronica also testified that she did not learn about Davis touching J.S. until after J.S. was being home-schooled. Before that time, J.S. had only told her about Davis talking about his anatomy. Flora Watson, the principal of Monticello High School, testified that 2008 was her first year as principal of the school. She observed Davis around the campus after his bus route and informed him that it was improper for him to just loiter at the school. Mrs. Watson stated at the trial that she knew Davis and his family and had indicated to him that it might be possible to find some kind of employment at the school which would give him a legitimate purpose for being there after ending his bus route; however, neither Mrs. Watson nor Davis pursued the idea of finding employment for him. Notably, Davis testified that he had never been told that he was not allowed to stay on the campus after his bus route.
|nMrs. Watson testified she was informed about J.S.’s complaint against Davis on October 27, 2008, when Mrs. Coleman brought J.S. to her office. At that time; J.S. explained to her that Davis had been sexually harassing her.
Mrs. Watson further testified regarding the school’s surveillance system, noting that the system was actually a monitoring system that would allow for review of internal tapes for approximately 30 days only. Mrs. Watson identified various photographs of the video monitoring system camera angles from around the school. Mrs. Watson noted that she did review the recordings of October 23, 2008, shortly after receiving J.S.’s complaint, and the only thing she was able to see was Dexter Davis moving around in the gym going toward the area where the girls were usually seated. There was no other evidence to directly confirm or refute J.S.’s complaint. Mrs. Watson testified that she did not inform anyone about the recording because she was not asked until after it was too late to retrieve the information from the system.
Mrs. Watson also identified a copy of J.S.’s report card from the 2008 school year which reflected that J.S. was present in school on October 23 and absent on October 24, 2008. J.S. was again present *1073 on October 27, 2008, but did not attend school anymore afterwards, and on November 12, 2008, a request for J.S.’s records was received and she was dropped from the school rolls. With regard to J.S. being checked out from school on October 23, 2008, Mrs. Watson identified a document generally used by parents or guardians to sign students out of school. On the October 23, 2008 date, it did not appear that J.S. was checked out of school; however, Mrs. Watson 112testified that it was not unusual for a student leaving late in the afternoon to leave the campus with a parent or guardian without the sheet being signed.
Elizabeth Brice, an administrative assistant (vice-principal) at Monticello High School, testified she recalled talking to J.S. about the incident that occurred on October 23, 2008. Mrs. Brice stated that she was walking in the elementary hall of the school when she saw J.S. sitting in Mrs. Coleman’s classroom at a computer. Mrs. Brice called J.S. out of the classroom to ask why she was there. J.S. started crying and asked Mrs. Brice if she could go to her office and talk. Mrs. Brice, observing no one else in the hallway, told J.S. they could talk there. At that time, J.S. told Mrs. Brice that the defendant had been sexually harassing her and when she was in the “lunch room” going to put her plate away, the defendant caught her leg. J.S. told Davis to take his hand off her leg. Mrs. Brice asked J.S. if she reported the information to the office and J.S. replied that she had. Mrs. Brice wrote a statement, two days later, at the direction of Mrs. Watson. Mrs. Brice noted that she reported in her statement exactly what J.S. had told her. Mrs. Brice indicated she had not observed the defendant and J.S. together at any time; however, she did note that the defendant usually sat at the end of the “teacher’s” table near where the students put away their trays.
Florice Coleman, a lab proctor at Monticello High School, testified that J.S. came to her room on October 27, 2008, and she appeared upset. When Mrs. Coleman asked her what was wrong, J.S. replied that someone could possibly lose their job when her father, who was working offshore, returned in two weeks. Mrs. Coleman attempted to find out what was wrong and asked J.S. to confide in her. J.S. stated that she did not want to get into trouble and she had not told her grandmother about the problem. As Mrs. |13Coleman continued to probe, J.S. told her that Davis had been harassing her for about two weeks. J.S. went on to say that when she was leaving school the week before, the defendant told her he wanted to have sex with her and that he described his body parts in detail to J.S. At that point, Mrs. Coleman told J.S. that she had to report the information to Mrs. Watson and it could not wait two weeks. Mrs. Coleman took J.S. to the office and had her repeat everything to Mrs. Watson.
Following closing arguments, the trial court rendered its decision. Finding that the state had failed to prove its case with regard to the charge against Davis for contributing to the delinquency of a minor, Davis was found not guilty. However, as to the charge against Davis for simple battery, the trial court noted that it found the testimony of the victim to be “honest” and that her testimony alone was sufficient to support the conviction. We believe that the record in this case supports the trial judge’s ruling finding Davis guilty of simple battery. Viewed in the light most favorable to the state, the evidence established that Davis, without the consent of J.S., intentionally touched J.S.’s leg during an encounter in the school’s cafeteria. J.S., through her own testimony, provided this account and this is sufficient to establish the-elements of (1) an intentional, use *1074 of force, (2) .against another person, and (3) without consent.
. The arguments presented by Davis are essentially that there were numerous inconsistencies and/or discrepancies between the testimony of the witnesses and accounts provided during the investigations by the school, police and school board. This argument is without merit. Any discrepancies in the testimony of the witnesses goes to the weight of the evidence and is a factor considered by the trier of fact in determining the credibility of the 114witnesses. See State v. Ashley, supra. The trier of fact in this case made it clear that he believed the testimony of the Victim and Veronica Ellerby as opposed to the testimony of Davis. Despite Davis’s arguments to the contrary, the discrepancies found in the testimony of the witnesses were not enough to undermine the veracity of their testimony. As noted by the trial judge, it is not uncommon that witnesses may vary slightly in their accounts of events, and, in fact, that makes their accounts more believable. It is not our function to assess the credibility of witnesses or reweigh evidence. The testimony of J.S. alone was sufficient to establish that Davis intentionally touched her thigh without her consent, thus committing a simple battery.
Further, Davis made much of the surveillance cameras utilized at the school, arguing that they would have surely shown something had he inappropriately touched J.S. as she claimed. Notably, however, it is inconclusive whether the cameras in the cafeteria or elsewhere on the campus would have picked up the precise site(s) where J.S. and Davis had contact on the school grounds, particularly the cafeteria. Nor does it seem, absent the cameras, that anyone would have actually seen Davis put his hand on her thigh under the tray railing as J.S. recounted. It is entirely plausible and reasonable to believe that could have occurred without any third person noticing.
Therefore, the assignments of error relating to the sufficiency of the evidence and the burden of proof are without merit.

Excessive Sentence

Davis also argues that his sentence of 60 days is excessive considering the fact that he has no previous record and he has a stable family and work | ^history. He also suggests that his sentence should have been probated. Davis notes that there is no undue risk that he might commit another crime while on probation, that his correctional treatment can best be provided without commitment to an institution, and finally that a lesser sentence would not deprecate the seriousness of the offense.
The test imposed by the reviewing court in determining the exces-siveness of a sentence is two-pronged. First, the record must show that the trial court' took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Lathan, 41,855 (La.App.2d Cir.02/28/07), 953 So.2d 890, writ denied, 2007-0805 (La.03/28/08), 978 So.2d 297. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Landos, 419 So.2d 475 (La.1982); State v. Swayzer, 43,350 (La.App.2d Cir.08/13/08), 989 So.2d 267. The important elements which should be considered are the defen *1075 dant’s personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Ates, 43,327 (La.App.2d Cir.08/13/08), 989 So.2d 259, writ denied, 2008-2341 (La.05/15/09),. 8 So.3d 581. There is no requirement that specific matters be given any particular weight at 11fisentencing. State v. Shumaker, 41,547 (La.App.2d Cir.12/13/06), 945 So.2d 277, writ denied, 2007-0144 (La.09/28/07), 964 So.2d 351.
Second, a sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.01/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 2001-0467 (La.01/15/02), 805 So.2d 166; State v. Robinson, 40,983 (La.App.2d Cir.01/24/07), 948 So.2d 379.
After providing the reasons for conviction, the trial judge merely stated that Davis was guilty of simple battery and sentenced him to serve 60 days in jail. Davis was given a delayed reporting date of September 1, 2009. While the trial judge did not specifically note the sentencing factors of La. C. Cr. P. art. 894.1, it was stated through the trial testimony that Davis had no prior record and was a husband, father, and grandfather. At the trial, Davis testified regarding his work history and personal history.
The sentencing provision for a conviction of simple battery provides that “Whoever commits a simple battery shall be fined not more than one thousand dollars or imprisoned for not- more than six months or both.” La. R.S. 14:35.
Considering the fact that the trial judge had wide discretion in determining Davis’s sentence and the fact that this sentence is in the low range for the offense of conviction, the trial court did not abuse its discretion in fashioning this sentence for this defendant. Louisiana C. Cr. P. art. 894 l17provides that the court may suspend the imposition or execution of the whole or any part of the sentence imposed, provided suspension is not prohibited by law, and place the defendant on probation. The statute does not require that a defendant receive a probated sentence.
While a probated sentence may have been more desirable to this defendant, in his opinion, it cannot be said that this sentence is excessive considering this defendant, the age of the young victim, the crime and its effect on this victim, and the harm done to society. Accordingly, this assignment of error is without merit.
Conclusion
For the foregoing reasons, the conviction and sentence of Joe A. Davis are affirmed.
AFFIRMED.
APPLICATION FOR REHEARING
Before BROWN, GASKINS, CARAWAY, DREW and LOLLEY, JJ.
Rehearing denied.