NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-345

STATE IN THE INTEREST OF J.R., III

**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. J-2016-052
HONORABLE E. DAVID DESHOTELS, DISTRICT JUDGE

**********

PHYLLIS M. KEATY
JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Phyllis M. Keaty, and
Candyce G. Perret, Judges.

AFFIRMED AS AMENDED;
REMANDED WITH INSTRUCTIONS.

John E. Demoruelle
Attorney at Law
Post Office Drawer B
Oberlin, Louisiana 70655
(337) 639-2220
Counsel for Defendant/Appellant:
        J.R., III

**H. Todd Nesom**
**District Attorney**
**Luke H. Abrusley**
**Joe Green**
**Assistant District Attorneys**
**Post Office Box 839**
**Oberlin, Louisiana  70655**
**(337) 639-2641**
**Counsel for Appellee:**
        **State of Louisiana**

**James Robinson, Sr.**
**On behalf of his minor child**
**J.R., III**
**In Proper Person**
**110 Duplichain Lane**
**Kinder, Louisiana  70648**
**Defendant/Appellant**

**KEATY, Judge.**

The Juvenile, J.R., III,[1] appeals the trial court's adjudication of him as delinquent for third degree rape and sexual battery. For the following reasons, we affirm the trial court's adjudication, amend the trial court's disposition, and remand with instructions.

## FACTS AND PROCEDURAL BACKGROUND

On January 9, 2016, the Juvenile, J.R., III, along with X.M., and the victim, T.W., spent the night at Johnny and Pearl Lavergne's residence. At that time, the Juvenile was thirteen years old; X.M was fifteen years old, and T.W. was fourteen years old. During the night and into the early morning hours of the following day, the Juvenile engaged in anal intercourse and oral sex with T.W. without his consent. As a result, a petition was filed charging the Juvenile with second degree rape and second degree sexual battery. Following the presentation of evidence at the hearing, the trial court adjudicated the Juvenile delinquent for third degree rape and sexual battery. It imposed a disposition on each count of two years in the custody of the Office of Juvenile Justice with placement in a non-secure facility, to run concurrently. One year was suspended, and the Juvenile was placed on two years of probation subject to special conditions.

The Juvenile is before this court seeking review of his delinquency adjudication.[2] On appeal, and in his only assignment of error, the Juvenile

---

[1] Pursuant to Uniform Rules—Courts of Appeal, Rule 5–2 and La.R.S. 46:1844(W), the initials of the parties will be used to protect and maintain the privacy of the minor children involved in this proceeding.

[2] Defense counsel originally filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396 (1967); however, after being ordered by this court to file a new brief in compliance with *State v. Jyles*, 96-2669 (La. 12/12/97), 704 So.2d 241, counsel submitted a brief in which he contended the evidence presented by the State was insufficient to adjudicate the Juvenile delinquent.

contends there was insufficient evidence to sustain the adjudication. The Juvenile's father also submitted a pro se brief wherein he contends the State erred by presenting insufficient evidence for a rational trier of fact to conclude that the Juvenile committed the two crimes for which he was adjudicated.

## DISCUSSION

### I. Error Patent Review

As noted by this court in *State in the Interest of T.T.*, 96-6, p. 2 (La.App. 3 Cir. 5/8/96), 677 So.2d 466, 467-68 (quoting *State in the Interest of C.D.*, 95-160 (La.App. 5 Cir. 6/28/95), 658 So.2d 39, 41):

> The Louisiana Children's Code is silent as to whether a juvenile criminal proceeding is entitled to an error patent review on appeal. However, La.Ch.C. art. 104 states the Louisiana Code of Criminal Procedure governs in matters which are not provided for in the Children's Code. Thus, we are mandated by La.C.Cr.P. art. 920 to conduct an error patent review despite the fact defense counsel did not request it.

After conducting an error patent review, we find one error patent regarding the trial court's advising the Juvenile of his rights, two issues requiring discussion, and an error patent concerning credit for time served.

First, the trial court's minutes indicate the Juvenile was not advised of his rights when he appeared to answer the allegations of the delinquency petition as required by La.Ch.Code art. 855. Pursuant to La.Ch.Code art. 855, the trial court must first determine if the juvenile is capable of understanding his rights, and if so, must advise the child of his rights, including the nature of the proceedings, the nature of the allegations of the petition, the right to an adjudication hearing, the right to appointed counsel, and the right against self-incrimination. In this case, we find that any error in failing to apprise the Juvenile of his rights pursuant to La.Ch.Code art. 855 is harmless as he was represented by counsel and entered a

2

plea of not guilty to the allegations contained in the petition. *See State in the Interest of D.B*, 13-1364 (La.App. 3 Cir. 4/23/14), 137 So.3d 1282, *writ denied*, 14-1092 (La. 1/9/15), 157 So.3d 596; *see also State in the Interest of C.P.*, 12-192 (La.App. 3 Cir. 6/6/12), 91 So.3d 1273.

Second, the Juvenile's disposition hearing was not held within thirty days after the adjudication as required under La.Ch.Code art. 892. Louisiana Children's Code Article 892 provides: "Prior to entering a judgment of disposition, the court shall conduct a disposition hearing. The disposition hearing may be conducted immediately after the adjudication and shall be conducted within thirty days after the adjudication. Such period may be extended for good cause."

At the close of the August 4, 2016 adjudication proceeding in this matter, the trial court asked: "Sentencing will be when?" In response, the prosecutor stated: "October 13, 2016." There was no objection by the Juvenile or his attorney. A similar issue was before this court in *State in the Interest of C.C.*, 13-417 (La.App. 3 Cir. 10/9/13), 124 So.3d 56. The juvenile was adjudicated delinquent on December 6, 2012, and the disposition hearing was originally set for January 29, 2013, which was beyond the thirty-day time limitation set forth in La.Ch.Code art. 892. On error patent review, this court addressed the untimely holding of the disposition hearing and found that the error was harmless because C.C. failed to allege that "any prejudice resulted from the delay." *Id.* at 59.

More recently, in *State in the Interest of D.B.*, 14-85, p. 2 (La.App. 3 Cir. 5/7/14), 141 So.3d 296, 298, addressing the untimeliness of an answer hearing, this court found that supreme court jurisprudence suggests that "a juvenile's failure to object to the untimely setting of a hearing constitutes a good cause extension of the time period." Louisiana Children's Code Article 892, like La.Ch.Code art. 854,

3

allows for an extension of the time period for good cause. Accordingly, we find that the Juvenile's failure to object to the setting of the disposition hearing outside of the time limit constituted good cause for an extension of the time period; thus, La.Ch.Code art. 892 was complied with, and no error patent occurred.

Third, the Juvenile did not answer the allegations of the petition within fifteen days as required by La.Ch.Code art. 854; however, there is no indication in the record that the Juvenile objected to the untimely hearing. In accordance with *D.B.*, 141 So.3d 296, we find that the Juvenile's failure to object constitutes good cause for an extension of the time period, and no error patent occurred.[3]

Finally, the record before this court does not indicate the Juvenile was given credit for time spent in secure detention, if any, prior to the imposition of disposition, as required by La.Ch.Code art. 898. Accordingly, this court amends the Juvenile's disposition to give him credit for time served in a secure detention facility prior to the imposition of disposition, if any. We further remand this matter to the trial court with instructions to note the amendment in the custody order and in the trial court's minutes. *See State in the Interest of J.A.*, 15-641 (La.App. 3 Cir. 12/2/15), 179 So.3d 959, *writ denied*, 15-2317 (La. 3/4/16), 188 So.3d 1058.

## II.   Assignment of Error

The Juvenile contends the evidence presented by the State was insufficient to prove his guilt beyond a reasonable doubt. The Juvenile points to the purported

---

[3] The Petition was filed on April 27, 2016. The answer hearing was held on May 24, 2016. There is no indication in the record when this hearing was set. Presumably, if the Juvenile objected to the untimely setting of the hearing, he would have done so at the answer hearing, and this would be reflected in the trial court's minutes. Since the minutes do not so indicate and given the fact that any violation is rendered moot upon adjudication, we need not order supplementation of the record with the order setting the hearing, if one exists.

conflicting evidence presented at the adjudication hearing concerning consent to the acts in question.

In a juvenile criminal proceeding:

> [T]he state's burden of proof is the same as in a criminal proceeding against an adult—to prove beyond a reasonable doubt every element of the offense alleged in the petition. La. Ch.Code art. 883; *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984).

*State ex rel. D.P.B.*, 02-1742, pp. 4-5 (La.5/20/03), 846 So.2d 753, 757 (first alteration ours). Additionally, in a juvenile criminal proceeding, the trial court's findings of fact are subject to the manifest error standard of review, and the appellate court should not disturb the trial court's reasonable evaluations of credibility and inferences of fact absent manifest error. *State in the Interest of C.P.*, 12-192 (La.App. 3 Cir. 6/6/12), 91 So.3d 1273. In the absence of internal contradiction or irreconcilable conflict with any physical evidence, a single witness' testimony is sufficient to support a factual conclusion if it is credited by the trial court. *State v. Davis*, 45,662 (La.App. 2 Cir. 11/3/10), 57 So.3d 1066, *writ denied*, 10-2677 (La.4/25/11), 62 So.3d 85. Further, discrepancies in factual testimony which require a determination of the witnesses' credibility go to the weight of the evidence, not its sufficiency. *Id.*

*J.A.*, 179 So.3d at 961.

In this case, the trial court adjudicated the Juvenile delinquent based on the commission of the lesser offense of third degree rape under the following subsection of La.R.S. 14:43:

> A. Third degree rape is a rape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of a victim because it is committed under any one or more of the following circumstances:

. . . .

4) When the offender acts without the consent of the victim.

For the charge of second degree sexual battery, the trial court's finding of guilt of the lesser offense of sexual battery was based on the following subsection of La.R.S. 14:43.1:

A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:

(1) The offender acts without the consent of the victim.

In its oral reasons for adjudicating the Juvenile delinquent for third degree rape, the trial court found that T.W. "is credible." The trial court noted T.W. failed to consent by explaining: "And when he said that he didn't want to and he said no, no means no." With respect to the trial court's adjudication for second degree sexual battery, it held that "[T.W.'s] testimony is credible[,]" and he failed to consent.

Keeping in mind the foregoing, we look to the evidence presented at the adjudication hearing. X.M., who was fifteen years old at the time of the proceeding, testified that on the night of January 9, 2016, and the following morning, he was at Johnny Lavergne's residence with the Juvenile and T.W. X.M. stated that Pearl Lavergne (hereinafter "Mrs. Pearl") was present at the home. He testified that the boys were in the bed watching television in the middle bedroom. X.M. revealed that while they were laying in the bed, T.W. removed his clothes even though neither X.M. nor the Juvenile asked him to do so. X.M. indicated that T.W. rolled onto his side and the Juvenile "humped" him. X.M. stated that the

6

Juvenile then asked T.W. to suck his penis, which he did. After being shown a statement that he gave to Deputy Charles Earl, X.M. testified that while the Juvenile was "humping" T.W., the Juvenile kept punching X.M. to have sex with T.W. X.M. revealed that after the Juvenile had sex with T.W., the three watched television for a little while and then X.M. had sex with T.W. X.M. testified that after everything was over, T.W. attempted to leave the room saying he was going to "tell on [them]." X.M. stated that he and the Juvenile told T.W. not to tell. X.M. revealed that they did not stop T.W. from leaving the room, although X.M. was lying on the floor in front of the door, the place he chose to sleep after "everything was over."

With respect to consent, X.M. testified that T.W. never said "[n]o" "[w]hile [the Juvenile] was humping" him. X.M. advised that prior to them getting into bed, T.W. told the Juvenile that he, i.e., T.W., wanted the Juvenile to have sex with him, i.e., T.W. X.M. explained that T.W. never told him, i.e., X.M., that he, i.e., T.W., wanted to have sex with the Juvenile, nor did T.W. tell X.M. that he did not want to have sex with the Juvenile. X.M. indicated that T.W. never told the Juvenile that he did not want to suck his penis. X.M. testified that T.W. never tried to fight the boys off and never tried to stop them from having sex with him. According to X.M., he slept on the floor after the incidents while the Juvenile and T.W. slept in the bed.

Deputy Kevin Sickey of the Allen Parish Sheriff's Office was the case agent involved in investigating the matter. With the consent of the Juvenile's mother, Deputy Sickey recorded the Juvenile's statement, which was played for the trial court during the adjudication hearing. We have reviewed the recorded statement. Therein, the Juvenile initially denied engaging in sexual activities with T.W. In

7

the second part of the interview, however, the Juvenile admitted to receiving a "blow job" from T.W. and said T.W. did not object.

David Duplichan of the Family and Youth Counseling Agency testified that he interviewed T.W. The recording of the interview, which we have also reviewed, was played for the trial court. In the interview, T.W's description of the events that occurred between him and the Juvenile were similar to his description of the events he provided at the adjudication hearing. T.W. also revealed additional information in the interview. Specifically, T.W. stated that the Juvenile told him that he, i.e., T.W., was going to be the woman that night. T.W. further stated that the Juvenile put some type of gel on his penis and told T.W. that he was putting it on there so it would go in his buttocks.

Mr. Duplichan testified that he found the following observations significant during his interview of T.W.:

> A    [T.W.] was much more expansive when he was talking about pleasant things, the dogs, you know, possibly getting a new car. When we got into the events of what he tells me happened, his body language, he tightened up. He became more hesitant in his answers. None of that is pleasant to talk about and it was obvious in his demeanor doing it. Some of the things that he mentioned - And I look at the video and you can see [T.W.], he just at his age and his intellectual level does not impress me as someone who would know that Vaseline is used on a penis so that it would go in easier.
>
> . . . .
>
> A    Yeah. Significant to me was the body language, the demeanor, the difference between when he was talking at the rapport building versus when we were talking the actual incident, the mention of the Vaseline, the fact that he misspelled penis. . . .
>
> . . . .
>
> A    The way that he spelled penis. He spelled it three different ways on the three different drawings. His embarrassment at just saying the word. Those are all things that I noticed that I thought were significant.

8

. . . .

A       Again, the use of the lubricant, the things that he was telling me happened versus the almost kid-like demeanor in not wanting to say the word, in the way that we spell the word, just indicated, you know, this was - what he was telling me was beyond something that he should know about.

On cross-examination, Mr. Duplichan agreed that during the interview, T.W. said that he had watched a similar incident happen to someone else a year before; thus, in the following exchange, Mr. Duplichan acknowledged that this could explain T.W.'s knowledge of something otherwise age inappropriate:

Q       And therefore he knew about this. It's not age inappropriate that he knew about this because he had personally seen it himself before?

A       He did say that he had seen that, yes, sir.

T.W. testified at the adjudication hearing. At the time of the incident, he lived with his mother, Ms. Williams.[4] T.W. confirmed that the interview given to Mr. Duplichan was a true account of the incident. At the adjudication hearing, T.W. testified that he was in the middle of X.M. and the Juvenile in bed watching television while X.M. and the Juvenile were on their phones watching videos of "nasty stuff." T.W. revealed that the Juvenile grabbed him on his penis. T.W. stated that he "told [the Juvenile] to stop and he didn't listen." T.W. testified that the Juvenile and X.M.'s response was: "'If you tell, I won't talk to you again.'" T.W. indicated that he got up and "tried to get out of the room but they had the door blocked to where [he] couldn't get out." T.W. testified that he attempted to leave the room "lots of times." T.W. stated that the Juvenile and X.M. each put their penis in his mouth and in his rectum without his permission and despite the

---

[4] T.W. testified at the adjudication hearing that he lived with his mother, Kristy Williams, after having lived with his "other" mother, Mrs. Pearl, until 2010.

fact that he told them to stop. His testimony reveals that the Juvenile held T.W. down while X.M. was on top of him, and when the Juvenile "put his penis in [T.W.'s] butt[,]" X.M. was on the other side of T.W. T.W. stated that he tried to stop them by telling them to leave him alone, but he was unsuccessful. T.W. revealed that he told the boys to stop "[l]ots of times." T.W. confirmed at the adjudication hearing that he never told the Juvenile that it was okay to do this. T.W. testified that he was scared and that he felt there was nothing he could have done to stop this. T.W. stated that the incidents ceased at approximately 1:00 a.m. T.W. testified that he told the boys he was going to "tell on them[,]" which he did "the next day." T.W. advised that the next morning, he told his mother, Kristy Williams (hereinafter "Ms. Kristy"), and she told Mrs. Pearl.

On cross-examination, T.W. testified that he left the bedroom a few minutes after the incident, but he returned because "that's where [he] was sleeping at." T.W. revealed the other two boys were still in there and were laughing and cutting up until around 3:00 a.m. T.W. stated that he asked Mrs. Pearl if the Juvenile could come over that day. T.W. testified that at one point, Mrs. Pearl asked him what was wrong, and he said nothing to her.

On redirect examination, T.W. explained that on the morning following the incident, the Juvenile left Mrs. Pearl's house. T.W. stated that he did not ask Mrs. Pearl if the Juvenile could come back over to the house. He explained that he misunderstood the earlier question on cross-examination wherein he said that he had asked Mrs. Pearl if the Juvenile could come back over that day. T.W. clarified that on the previous evening and prior to the incident, he asked Mrs. Pearl if the Juvenile could spend the night. T.W. testified that he did not ask Mrs. Pearl if the Juvenile could come back over to the house after the incident occurred.

At the hearing, Mrs. Pearl testified that X.M. was at her house. Mrs. Pearl stated that the Juvenile was at her mother-in-law's house, which was located "across the field," and Mrs. Pearl called him over because her five-year-old son wanted to see him. Mrs. Pearl explained that T.W. visited her house later that evening and asked her if the Juvenile could spend the night. Mrs. Pearl noted that she raised T.W. until he was ten years old. Mrs. Pearl revealed that she never entered the bedroom where the boys were staying, but she "heard a lot of bumping going on in the room, which [she] thought [was] the boys [] playing around." Mrs. Pearl explained that "[the Juvenile] and [T.W.] play - [they] grew up together, so they made lots of noises as kids. So [she] didn't go into [the bedroom] to look at what was going on."

Mrs. Pearl revealed that around 1:30 a.m., T.W. stepped out of the room with a "strange look on his face." According to Mrs. Pearl's testimony, when she asked him what was wrong, T.W. said nothing. Mrs. Pearl opined that T.W. was mad because "his mom didn't come and pick him up[]" as originally planned and that "[h]e usually gets like that." Mrs. Pearl stated that she was awakened that morning at 8:30 by a phone call from Ms. Kristy who said that she needed to come over to speak with her. At this point, all three of the boys were gone, according to Mrs. Pearl's testimony. Mrs. Pearl explained that Ms. Kristy arrived and was accompanied by T.W, who was crying. Mrs. Pearl noted that "[T.W.] was walking . . . really really funny" and told her that the boys "were bullying him in the room." Mrs. Pearl testified that Ms. Kristy said: "'[T.W.], tell her what they did to you.'" Mrs. Pearl stated that after T.W. told her what happened, the Juvenile's mother arrived. Mrs. Pearl stated that T.W. told the Juvenile's mother about the incident, who subsequently called the Juvenile to the house. Mrs. Pearl

11

explained that when she asked the Juvenile about the incident, "he said that he didn't do anything[,] and he took off running out of the house." Mrs. Pearl testified that she called her daughter who then contacted the police.

On cross-examination, Mrs. Pearl explained that the Juvenile had left her house shortly before they had supper on the evening in question, and T.W. asked her if the Juvenile could come back for a sleepover. According to Mrs. Pearl's testimony, the Juvenile then returned from his mother's house next door. Mrs. Pearl was asked about whether T.W. told her anything when he came out of the bedroom on the evening in question, and she responded:

> A    No, [X.M.] stood in front of him. Because [T.W.] was looking puzzled and then I said, "[T.W.], what's wrong?" And then [X.M.] came out. And then the next thing you know, [T.W.] was back in the room. He didn't say anything. [X.M.] was standing in front of him.

Tammy Smith, a sexual assault nurse examiner with Lake Charles Memorial Hospital, was accepted by the trial court as an expert in her field. Ms. Smith testified that she examined T.W. on January 10, 2016, following a sexual assault report. Ms. Smith explained that T.W. told her that "he was assaulted on [January 10, 2016] after midnight" by X.M., his step-cousin, and the Juvenile, his cousin. Ms. Smith testified that T.W. explained that he was held down by his shoulders. According to her testimony, he reported that his mouth and his rectum were penetrated by the Juvenile's penis. Ms. Smith indicated that T.W. said his rectum was also penetrated by X.M.'s penis and finger, and X.M. fondled T.W.'s genitalia under his clothing. Ms. Smith revealed that T.W. said Vaseline was used as a lubricant during the assault. Ms. Smith testified that T.W. told her he was on his stomach during the assault, and the other two boys laid on top of him.

Ms. Smith detailed what T.W. told her had happened that night:

A  He said, "I was in my bed . . . he started and reached over me while I was watching TV." And I said, "Who was reaching?" And he said, "[the Juvenile]. And then he grabbed my penis. Both of them were watching bad stuff - some freaky stuff on their phones. [The Juvenile] said that I was going to play the role of a woman. He turned me over[,] and he put his penis in my rear end. I told him to stop. He didn't stop. I told him that I had pain problem back there and he still didn't care. [X.M.] was there. He, [X.M.], did it after [the Juvenile]. [X.M.] . . . " And then this is me, I said, "[X.M.] did what after [the Juvenile]?" "He put his penis in my rear end." And then I clarified and I said, "When did [the Juvenile] put his penis in your mouth?" "Before he put it in my rear end." "While [X.M.] was doing it, [the Juvenile] just stayed there. After [X.M.] got done, then [the Juvenile] came back and put his penis back in. After he was done, I left and I saw my mom. I wanted to tell but then [X.M.] came out and went to the bathroom. I went back to the bedroom. When he came back, I told [X.M.] to get out of the bed and sleep on the floor. I went to sleep. When I woke up, I came back to her house. When I got there, I told her." And [Ms. Kristy] was who he was saying that he told.

Ms. Smith testified that the toluidine blue dye she used during T.W.'s exam to determine whether his skin was broken revealed tears on the outside of his anus at the one o'clock and the seven o'clock positions. He also exhibited redness and tenderness in his anal area, according to her testimony.

On cross-examination, Ms. Smith confirmed that she could not determine whether the incident was consensual or forced. Ms. Smith testified that she could only report what T.W. revealed to her prior to the exam and that he told her he did not have consensual sex with anyone in the five days prior to this incident.

Deputy Earl of the Allen Parish Sheriff's Office interviewed X.M. and also was present during the second part of Deputy Sickey's interview with the Juvenile. Deputy Earl testified that during the interview, the Juvenile initially told him that he had no anal or oral sexual interaction with the victim. Deputy Earl explained that after the Juvenile's mother told him to tell the truth, he "admitted that he got a blow job after [X.M.] had sex with . . . [T.W.]. But he never admitted to anything else."

13

As for his interview with X.M., Deputy Earl testified that X.M. never said T.W. took his clothes off voluntarily or that T.W. requested that the Juvenile have sex with him, i.e., T.W. A review of the recorded statement introduced at trial, which this court has reviewed, reveals that X.M. said the Juvenile "humped" T.W. first, and after he finished, he hit X.M. and made X.M. "do it." X.M. stated that after this, the Juvenile made T.W. "suck him," according to the recorded statement.

The Juvenile testified at the adjudication hearing that he was thirteen years old at the time of the hearing. When asked if he had sex with T.W., he replied, "Yes, sir. I just got a blow job." He testified that the "blow job" was not forced and that T.W. had asked the Juvenile to have sex with him. Other than saying he was not going to talk to T.W. anymore, the Juvenile testified that he made no threats.

On cross-examination, the Juvenile denied having sex with T.W. with the exception of receiving a "blow job" and testified that X.M. was the only one who had sex with T.W. The Juvenile stated that he did not force X.M. to have sex with T.W. The Juvenile admitted that he lied to Deputy Sickey when he said nothing happened. He further testified that X.M. lied in court and to the detectives when he said the Juvenile had sex with T.W. The Juvenile stated that T.W. was lying when he said the Juvenile had sex with him.

We find that T.W.'s testimony sufficiently established the elements of the offenses of third degree rape and sexual battery. We, therefore, affirm the trial court's adjudication of the Juvenile as delinquent for third degree rape and sexual battery.

**II.    Pro Se Brief**

The Juvenile's father filed a pro se brief contending the State failed to prove its case beyond a reasonable doubt because T.W. consented to the acts. He argues that if items that were seized, i.e., the Juvenile and X.M.'s cell phones, blankets, and boys' clothing, substantiated T.W.'s version of events, then the State would have introduced them at trial. The Juvenile's father attached to his brief a detective's report not introduced in evidence at trial in support of his contention that T.W. consented to the sexual acts.

In reviewing a claim of insufficient evidence, this court cannot consider evidence which is not introduced at trial. "Evidence outside the record may not be reviewed by appellate courts. *See, e.g., State v. Hilaire*, 216 La. 972, 45 So.2d 360 (1950)." *State in the Interest of J.C.R.*, 14-1146, p. 4 (La.App. 3 Cir. 3/4/15), 157 So.3d 1284, 1287. Thus, the information contained in the detective's report cannot be considered by this court. As discussed above, the evidence presented at trial was sufficient to support the adjudication of delinquency for third degree rape and sexual battery. T.W.'s testimony, found credible by the trier of fact, was sufficient to establish the elements of both crimes for which the Juvenile was adjudicated delinquent. The father's claim, therefore, is without merit.

**CONCLUSION**

This court affirms the trial court's adjudication of the Juvenile as delinquent for third degree rape and sexual battery. We amend the Juvenile's disposition to give him credit for time served in a secure detention facility prior to the imposition of disposition, if any, and affirm as amended. We further remand this matter to the trial court with instructions to note the amendment in the custody order and in the trial court's minutes.

**AFFIRMED AS AMENDED; REMANDED WITH INSTRUCTIONS.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.